In the

# United States Court of Appeals

### For the Seventh Circuit

_____

No. 07-1791

MICHELLE WHEELER,

*Plaintiff-Appellant,*

*v.*

RONALD LAWSON, individually and
in his official capacity as an
officer of the Starke County
Sheriff's Department, ROBERT SIMS,
in his official capacity as
Sheriff of Starke County, and
STARKE COUNTY COMMISSIONERS,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 05 C 421—**Robert L. Miller, Jr.**, *Chief Judge.*

_____

ARGUED MAY 15, 2008—DECIDED AUGUST 21, 2008

_____


Before RIPPLE, KANNE and WILLIAMS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Michelle Wheeler filed this action
under 42 U.S.C. § 1983 against Ronald Lawson, individu-

ally and in his official capacity as an officer of the Starke County Sheriff's Department. Ms. Wheeler alleges that Detective Lawson violated the Fourth Amendment, as made applicable to the States by the Fourteenth Amendment, by unlawfully arresting her without probable cause for maintaining a common nuisance. Detective Lawson filed a motion for summary judgment, which the district court granted.[1] Ms. Wheeler timely appeals.[2]

For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A.

In April 2004, Ms. Wheeler resided with her three children in a home in Knox, Indiana. During this time, she was separated from her husband, Charles Darren Wheeler ("Darren"), who lived fifteen to twenty minutes away; Darren visited Ms. Wheeler and the children about once a week. The residence, which was owned jointly by Ms. Wheeler and Darren, had an attached two-car garage, which is not at issue in this case. It also had a separate detached garage (or the "garage") that was located about 500 to 600 feet from the residence. Ms. Wheeler's arrest stems from a fire that occurred on April 6, 2004, in the detached garage.

---

[1]  The district court had jurisdiction under 28 U.S.C. § 1331.

[2]  Our jurisdiction is premised on 28 U.S.C. § 1291.

The two-car garage was outfitted with a video surveillance camera, which was focused on the door of the detached garage and part of the backyard area. The record is silent as to when the camera was installed. The camera allowed an occupant to monitor the area from a video screen inside the residence. This camera, however, would not allow someone to monitor activity inside the garage. The record does not disclose the size of the garage, although it does indicate that the garage had more than one room. At her deposition in this case, Ms. Wheeler testified that the garage contained tools, a go-cart, bicycles, a lawnmower, patio equipment, clothing and other items. The garage also contained propane tanks for a gas grill, fuel for the go-cart, paint, starter fluid and carburetor fluid. At her deposition, Ms. Wheeler further testified that she went to the garage about once a week and that her children used the garage with more frequency to access the bicycles and go-cart.

On April 5, Darren came to Ms. Wheeler's residence with Mark Dillard, Ms. Wheeler's cousin. The men told Ms. Wheeler that they were going to work on Mark's van in the garage. Ms. Wheeler did not go into the garage that day. She only had contact with Darren, who came inside the house to make himself lunch and dinner, although Darren ate by himself both times. The men worked in the garage from 10:00 a.m. to 8:00 p.m. At 8:00 p.m., Darren informed Ms. Wheeler that he was leaving and that Mark was going to continue working on the van inside the garage. Shortly after Darren left, Ms. Wheeler called him to request that he buy her a pack of cigarettes.

Darren returned shortly thereafter with the requested cigarettes, and he ran into Rusty Dillard in the driveway of Ms. Wheeler's residence. Rusty is Mark's brother and Ms. Wheeler's cousin. Darren gave the cigarettes to Ms. Wheeler and left. Unbeknownst to Ms. Wheeler, Rusty Dillard joined Mark Dillard inside the garage.

Ms. Wheeler went to bed at approximately 10:30 or 11:00 p.m.; she testified that she had assumed that Mark had left the garage by this time. At about 1:00 a.m., Ms. Wheeler was awakened by a loud explosion that she subsequently described as sounding like "dynamite." R.33, Ex. A at 58. From her bedroom window, she saw smoke rolling out from the back of the garage. Ms. Wheeler called 911. Next, she called her husband, Darren, and her cousin, Mark Dillard, to inform them of the fire. Ms. Wheeler learned (for the first time) from Mark that Rusty had been in the garage that evening.

Detective Ronald Lawson of the Starke County Sheriff's Department arrived on the scene shortly thereafter. Two officers on the scene informed Detective Lawson that there was a body in the garage and that Ms. Wheeler had a video system set up for the garage area. Inside the garage, Detective Lawson noticed that the body was near the point of origin of the fire. In that area, there was a furnace, two propane tanks that were ruptured, thirty cans of starter fluid and lithium batteries that had been broken apart. Someone had used a can-opener to open the bottom of the starter fluid cans. Detective Lawson also found a clear plastic bag with a powdery substance that later was determined to be methamphetamine; autopsy

tests performed on Rusty Dillard revealed the presence of methamphetamine in his system.[3]

Detective Lawson noticed that the valves of the propane tanks had been altered, and, based on his prior experience, Detective Lawson knew that these tanks and the type of connection on them often are used in methamphetamine labs. The previous year, Detective Lawson had investigated a death caused during the explosion of a methamphetamine lab, and he had noted that the scene at Ms. Wheeler's garage had many of the same characteristics. For example, the propane cylinders contained ammonia residue commonly found in the form of anhydrous ammonia (liquid) farm fertilizer, and the debris on the floor near Rusty Dillard's body had a strong odor of ammonia. Inside the furnace, the police found battery casings and aluminum foil. Batteries are commonly broken apart to obtain lithium metal to assist in the methamphetamine manufacturing process; aluminum foil is commonly used to smoke methamphetamine. The Detective also searched the white Ford pick-up truck in Ms. Wheeler's driveway. The truck, which had been driven by Rusty Dillard, contained a full can of starter fluid.

---

[3] Throughout the brief investigation, Detective Lawson was assisted by Detective Daniel Anderson, also of the Starke County Sheriff's Department and a specialist in drug and methamphetamine cases. Detectives Lawson and Anderson also received assistance in processing the scene from Trooper Thomas Quinn of the Indiana State Police Clandestine Laboratory Team.

Detective Lawson had only two brief talks with Ms. Wheeler, immediately before and immediately after the fire was extinguished. During these short conversations, Ms. Wheeler told the Detective that she did not know the cause of the fire, that she was not aware that Rusty Dillard had been inside the garage and that she was not aware of any methamphetamine production taking place on her property. Ms. Wheeler also informed Detective Lawson that she had called her husband to inform him of the fire; she mentioned to the Detective that she and Darren were separated. Detective Lawson otherwise did not interview Ms. Wheeler about the fire, the metham-phetamine or the methamphetamine-related items found inside the garage. Prior to arresting her, Detective Lawson did not ask Ms. Wheeler whether she had any personal items in the garage, nor did he question her about her use of the garage. Detective Lawson spoke only briefly with Darren Wheeler on the night of the incident. Neither he nor any other officer conducted any follow-up inter-views with Darren. Detective Lawson never interviewed Mark Dillard, who was the last individual to see Rusty Dillard alive inside the garage.

The Detective subsequently signed an affidavit of probable cause;[4] an information was filed on June 9

---

[4] A statement attached to the probable cause affidavit noted that a batch of one ounce of methamphetamine requires the use of six to eight cans of starter fluid (ether) and about one quart of liquid anhydrous ammonia. The affidavit noted that, inside Ms. Wheeler's garage, the officers found two cylinders with a

(continued...)

charging Ms. Wheeler with maintaining a common nuisance, which is prohibited by Indiana Code § 35-48-4-13. About two weeks later, on June 22, Detective Lawson arrested her on the charge of maintaining a common nuisance. In November 2004, the charge against her was dismissed on the motion of the Starke County Prosecutor's Office.[5]

**B.**

Ms. Wheeler filed this action under 42 U.S.C. § 1983 against Detective Lawson, individually and in his official capacity as an officer of Starke County Sheriff's Department.[6] Ms. Wheeler alleges that Officer Lawson violated

---

[4] (...continued)

capacity of six gallons of liquid anhydrous ammonia and over 30 cans of starter fluid. The affidavit stated: "Items in the amounts found show several batches of illegal [m]ethamphetamine[] have been manufactured at the Wheeler residence before the fire and explosion." R.33, Ex. J at 4.

[5] Ms. Wheeler's section 1983 action therefore is not barred under *Heck v. Humphrey*, 512 U.S. 477 (1994).

[6] Ms. Wheeler's complaint also named as defendants Robert Sims, in his capacity as Sheriff of Starke County, and the County Commissioners of Starke County, Indiana. The district court granted summary judgment with respect to these defendants. The court also held that Ms. Wheeler abandoned her claims based on alleged violations of the Fifth and Fourteenth Amendments and could not maintain an action for a violation of Article

(continued...)

the Fourth Amendment, as made applicable to the States by the Fourteenth Amendment, by unlawfully arresting her. Officer Lawson filed a motion for summary judgment, which the district court granted. The court concluded that Detective Lawson had probable cause to arrest Ms. Wheeler for maintaining a common nuisance under Indiana law. Ms. Wheeler timely appeals the judgment of the district court.

## II

## DISCUSSION

### A.  Standard of Review

This court reviews de novo a grant of summary judgment. *Hurst-Rosche Eng'rs, Inc. v. Commercial Union Credit Ins. Co.*, 51 F.3d 1336, 1341 (7th Cir. 1995). All facts and reasonable inferences must be construed in favor of the non-moving party, here, Ms. Wheeler. *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005). We do not evaluate the weight of the evidence, judge the credibility of witnesses or determine the ultimate truth of the matter; rather, we determine whether there exists a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions

---

[6]  (...continued)

I, § 11 of the Indiana Constitution. Ms. Wheeler does not appeal any of these determinations.

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Magin*, 420 F.3d at 686 (citing Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). The moving party bears the initial burden of demonstrating that these requirements have been met; it may discharge this responsibility by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 323. To overcome a motion for summary judgment, the non-moving party must come forward with specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. *Anderson*, 477 U.S. at 251-52. The non-moving party must show that there is evidence upon which a jury reasonably could find for the plaintiff. *Id.*

### B.  Ms. Wheeler's Unlawful Arrest Claim

Probable cause is an absolute defense to a claim of wrongful arrest asserted under section 1983 against police officers. *Wagner v. Wash. County*, 493 F.3d 833, 836 (7th Cir. 2007) (per curiam); *Potts v. City of Lafayette*, 121 F.3d 1106, 1113 (7th Cir. 1997). A police officer has probable cause to arrest "if, at the time of the arrest, the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the

suspect has committed, is committing, or is about to commit an offense.'" *Wagner*, 493 F.3d at 836 (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)) (alteration in original); *see also Beck v. Ohio*, 379 U.S. 89, 90 (1964); *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993). Probable cause, therefore, "does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Sawyer*, 224 F.3d 675, 679 (7th Cir. 2000) (explaining that there must be a "probability or substantial chance of criminal activity on the suspect's part"). In determining whether an officer had probable cause, the court steps into the shoes of a reasonable person in the position of the officer. *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). Consequently, we "evaluate[] probable cause 'not on the facts as an omniscient observer would perceive them,' but rather 'as they would have appeared to a reasonable person in the position of the arresting officer.'" *Id.* (quoting *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 2000)). The probable cause determination must be made by a jury "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Maxwell*, 998 F.2d at 434 (explaining that, "[i]f the underlying facts supporting the probable cause determination are not in dispute, the court can decide whether probable cause exists").

Detective Lawson submits that he had probable cause to arrest Ms. Wheeler for maintaining a common nuisance. The Indiana Code defines the offense of "maintaining a common nuisance" as follows:

A person who knowingly or intentionally maintains a building, structure, vehicle, or other place that is used one (1) or more times:

> (1) by persons to unlawfully use controlled substances; or
>
> (2) for unlawfully:
>
>> (A) manufacturing;
>>
>> (B) keeping;
>>
>> (C) offering for sale;
>>
>> (D) selling;
>>
>> (E) delivering; or
>>
>> (F) financing the delivery of;
>
> controlled substances, or items of drug paraphernalia as described in IC 35-48-4-8.5;

commits maintaining a common nuisance, a Class D felony.

Ind. Code § 35-48-4-13(b). The knowledge element of this crime may be established by showing that the defendant had constructive possession of the drugs and other contraband. *Bradley v. State*, 765 N.E.2d 204, 212 (Ind. Ct. App. 2002); *see also Jones v. State*, 807 N.E.2d 58, 65 (Ind. Ct. App. 2004). To establish constructive possession, the defendant must have had (1) the intent to maintain dominion and control over the drugs and (2) the capability to maintain dominion and control over the drugs. *Jones*, 807 N.E.2d at 65; *Chandler v. State*, 816 N.E.2d 464, 467-68 (Ind. Ct. App. 2004). Indiana courts have defined "control" as "the

power, by way of legal authority, or in a practical sense, to control the place where, or the items in which, the substance is found." *Jones*, 807 N.E.2d at 65 (internal quotation marks and citation omitted). To prove the intent element, the Indiana courts have held that

> the State must demonstrate the defendant's knowledge of the presence of the contraband. This knowledge may be inferred from either the exclusive dominion and control over the premises containing the contraband or, if the control is non-exclusive, evidence of additional circumstances pointing to the defendant's knowledge of the presence of the contraband.

*Id.* (citation omitted). Under Indiana law, therefore, when possession is non-exclusive, constructive possession may be proved with the assistance of additional circumstances corroborating the defendant's knowledge of the contraband. These additional circumstances include: (1) incriminating statements given by the defendant; (2) attempted flight or furtive gestures; (3) a drug manufacturing setting; (4) proximity of the defendant to the contraband; (5) contraband in plain view; and (6) location of the contraband in close proximity to items owned by the defendant.[7] *Id.*; *see also Bradley*, 765 N.E.2d at 212.

---

[7] Both parties contend (and the district court assumed) that the crime of maintaining a common nuisance requires the State to prove a continuous or recurring violation. As support for this proposition, the parties rely on *Wells v. State*, a 1976 case that interpreted the term "maintaining" to require a "showing of

(continued...)

These circumstances are probative and corroborative of actual knowledge because their presence increases the likelihood that the defendant observed or was aware of the contraband. Concomitantly, the presence of these corroborating circumstances decreases the likelihood that the concept of constructive knowledge will be stretched so broadly that it will ensnare innocent bystanders. *See Godar v. State*, 643 N.E.2d 12, 15 (Ind. Ct. App. 1994) ("Mere presence where drugs are located or association with persons who possess drugs is not alone sufficient to support a finding of constructive possession."); *Snyder v. State*, 460 N.E.2d 522, 525 (Ind. Ct. App. 1984) (recogniz-

---

[7] (...continued)
more than an isolated or casual instance of the prohibited activity." 351 N.E.2d 43, 46 (Ind. Ct. App. 1976). After *Wells*, Indiana courts continued to require such a showing. *See, e.g., Bryant v. State*, 660 N.E.2d 290, 302 (Ind. 1995). In 1998, however, the Indiana General Assembly amended Indiana Code § 35-48-4-13(b) to add the phrase "one (1) or more times." 1998 Legis. Serv. P.L. 31-1998. *Compare* Ind. Code § 35-48-4-13(b) (2008), *with* Ind. Code § 35-48-4-13(b) (1997). As a result, the statute currently states: "A person who knowingly or intentionally maintains a building, structure, vehicle, or other place that is used one (1) or more times." Ind. Code § 35-48-4-13(b). This amendment abrogates the holding of *Wells*, which required proof of more than an "isolated or casual instance of the prohibited activity." *Wells*, 351 N.E.2d at 46. Indeed, the Indiana Court of Appeals took notice of this amendment in *Hale v. State*, 785 N.E.2d 641, 644 (Ind. Ct. App. 2003). The crime of maintaining a common nuisance, accordingly, no longer requires a showing of more than an isolated or casual instance of the prohibited activity.

ing the importance of "link[ing] the accused with the substance in question"); *Watt v. State,* 412 N.E.2d 90, 98 (Ind. Ct. App. 1980) ("[M]ere presence in the place [where the contraband is found] is not sufficient proof of intent to possess the substance." (internal quotation marks omitted)); *see also United States v. DiNovo,* 523 F.2d 197, 201 (7th Cir. 1975). The Indiana courts have recognized the doctrine's breadth, and, at least in the sufficiency of the evidence context, they have exercised vigilance to maintain the doctrine within its proper and intended scope. *See, e.g.,* *Chandler,* 816 N.E.2d at 468 (reversing a jury verdict because "the contraband was found in an undisclosed location in a middle bedroom and in the living room" and "not close to or intermingled with items" that the defendant owned); *Smith v. State,* 787 N.E.2d 458, 461 (Ind. Ct. App. 2003) (overturning a jury verdict because there was an absence of evidence that the defendant was in close "proximity to the contraband" or that the contraband was found in the defendant's "plain view"). With these principles in mind, we turn to the parties' submissions.

Detective Lawson asserts that two of the additional circumstances corroborating a defendant's knowledge—"a drug manufacturing setting" and "contraband [] in close proximity to items owned by the defendant"—are present in this case. He contends that Ms. Wheeler visited the garage on a weekly basis and that the contraband in the garage was found within close proximity to items belonging to her. The Detective further explains that numerous items used to manufacture methamphetamine and methamphetamine itself were found inside the garage, in-

dicating that her personal items were in a drug manufacturing setting. These circumstances, according to the Detective, along with the security camera that was focused on the entrance of the garage, were sufficient to give him probable cause to arrest Ms. Wheeler for maintaining a common nuisance.

We believe that, under the particular facts of this case, these additional circumstances did not create probable cause to believe that Ms. Wheeler knowingly or intentionally had maintained a common nuisance. As a preliminary matter, we must observe that the record suggests that the investigation about Ms. Wheeler's conduct was undertaken in a rather nonchalant manner. Aside from short discussions with her immediately before and immediately after the fire was extinguished, Detective Lawson did not interview Ms. Wheeler about the fire or about the methamphetamine and methamphetamine-related items found inside the garage. During these two brief conversations, Detective Lawson learned only that Ms. Wheeler did not know the cause of the fire, that she was not aware that Rusty Dillard had been inside the garage and that she was not aware of any methamphetamine production taking place on her property. Detective Lawson did not ask Ms. Wheeler whether she had any personal items in the garage, and he did not question her about the frequency with which she used the garage. Detective Lawson also spoke only briefly with Darren Wheeler on the night of the incident, and neither the Detective nor any other officer conducted any follow-up interviews with him, despite his obvious and more prominent use of the garage. Even more notable is Detective Lawson's failure to interview

Mark Dillard, who was the last individual to see Rusty Dillard alive inside the garage.

These considerations are particularly relevant because, as we have noted, the probable cause inquiry turns on the evidence and circumstances known to the officer *at the time of arrest*. "Any evidence . . . that came to light after the arrest," we have explained, "is not relevant to the probable cause inquiry." *Maltby v. Winston*, 36 F.3d 548, 557 (7th Cir. 1994). Before the district court and on appeal, Detective Lawson asserts that Ms. Wheeler stored numerous personal items, including bicycles, a lawnmower, patio equipment and clothing, inside the garage and that she used the garage about once a week. In support of this factual assertion, however, Detective Lawson relies only upon Ms. Wheeler's deposition that was taken for purposes of this case. Critically, nothing in Detective Lawson's deposition or in the reports that were created in the course of the investigation indicates that, at the time that he arrested Ms. Wheeler, he knew that she kept personal items in the garage or that she used the garage once a week. This absence of evidence thus eliminates one of the corroborating circumstances upon which Detective Lawson relies.

The second corroborating factor to which Detective Lawson points is that there was evidence of a drug manufacturing setting. A drug manufacturing setting, however, is probative and corroborative of a defendant's knowledge of contraband only to the extent that the

defendant had been around the manufacturing setting.[8]
Detective Lawson, as we already have noted, had no
evidence regarding Ms. Wheeler's use of the garage and no
evidence from which he could infer reasonably that
Ms. Wheeler had entered the garage recently.

In any event, even if there had been such evidence, we
believe that this factor alone would have been insufficient
to give Detective Lawson probable cause to arrest Ms.
Wheeler. Although the property on which the contraband
was found was owned jointly, Detective Lawson knew that
Ms. Wheeler and her husband were living apart at the time
that the fire occurred. From his discussion with Darren,
Detective Lawson also knew that the contraband in the
garage was found after Ms. Wheeler's husband had spent
the entire day in the garage with Mark Dillard. At no
point in the day did Ms. Wheeler enter the garage, and, as
far as she was aware, the men were performing work on
Mark Dillard's van. Both Ms. Wheeler and Darren told
Detective Lawson that Ms. Wheeler was unaware that
Rusty Dillard had arrived at the garage that evening and
had remained inside after Darren and Mark Dillard left.
Only after the explosion, when Ms. Wheeler called her

---

[8] *See, e.g.*, *Floyd v. State*, 791 N.E.2d 206, 210-11 (Ind. Ct. App.
2003) (explaining that "the officers found many of the items
commonly used in manufacturing methamphetamine scattered
around the kitchen and living room in plain view"); *Jones*, 807
N.E.2d at 65 (noting that authorities found digital scales, plastic
baggies, ties and over forty-three grams of crack cocaine and
that many of these items were found in multiple rooms of the
house).

husband and Mark to inform them of the fire, did she learn that Rusty Dillard had been in the garage.

All of the methamphetamine-related items found in the garage, moreover, are common items that would not raise a layperson's suspicion about drug production. The presence of these items might have appeared particularly commonplace because Ms. Wheeler's husband performed mechanical work on the side to supplement his carpentry job. With respect to the other items stored in the garage, there is no indication that, on days prior to the time of the fire, they were used in the manufacturing of methamphetamine. Although Detective Lawson found propane tanks and starter fluid, he also found a grill and a go-cart. Notably, there is no suggestion in the record that Detective Lawson knew that, prior to April 6, these common items had been kept together or arranged in a manner resembling a methamphetamine manufacturing setting. The record contains no evidence that, on the days prior to the fire when Ms. Wheeler may have visited the garage, the items had been kept in such a manner. In any event, nothing indicated to Detective Lawson that Ms. Wheeler had entered the garage while those items were so arranged.

More fundamentally, the record does not indicate how long these items had been in the garage. Although a clear bag containing methamphetamine was found near Rusty Dillard's body, Detective Lawson did not find anything indicating that this methamphetamine had been there prior to Rusty's arrival that evening. Indeed, the record supports an inference to the contrary—namely, that Rusty Dillard had produced the methamphetamine

himself that night. The pick-up truck that Rusty drove contained starter fluid, and laboratory testing further revealed that, at the time of his death, Rusty had methamphetamine in his system.

Finally, Detective Lawson attached great significance to the security camera that had been installed on the garage. The presence of the security camera, standing alone, however, was insufficient to provide probable cause to arrest Ms. Wheeler for maintaining a common nuisance. The garage contained many valuable items, including a go-cart and a grill, and, therefore, the presence of the security camera does not corroborate the notion that Ms. Wheeler knew that Rusty Dillard or anyone else had been manufacturing methamphetamine inside the garage.

There is no suggestion in the record, nor does Detective Lawson contend, that the other factors that are corroborative of knowledge were present here. Ms. Wheeler called 911 immediately after she was awakened by the explosion, and she did not make any incriminating statements; nor does Detective Lawson indicate that there was anything suspicious about Ms. Wheeler's answers to his questioning at the crime scene. In short, Detective Lawson did not have any evidence tying Ms. Wheeler to the methamphetamine production other than her familial bond (cousin) to the individual, Rusty Dillard, who was involved in that illicit activity, and the fact that she resided on the property.

There is no evidence in the record that Detective Lawson knew, at the time that he arrested Ms. Wheeler, that she either used the garage with any frequency or that she

had personal items stored in the garage. Furthermore, Detective Lawson could not infer reasonably that the methamphetamine-related items had been arranged in a manner resembling a methamphetamine manufacturing setting prior to the date of the fire. Consequently, we conclude that, as a matter of law, Detective Lawson did not have probable cause to arrest Ms. Wheeler.[9]

We shall now turn to the issue of qualified immunity.

## C. Qualified Immunity

The doctrine of qualified immunity shields from liability public officials who perform discretionary duties, *Belcher v. Norton*, 497 F.3d 742, 749 (7th Cir. 2007), and it thus protects police officers "who act in ways they reasonably believe to be lawful." *Anderson v. Creighton*, 483 U.S. 635,

---

[9] Detective Lawson contends that he also had probable cause to arrest Ms. Wheeler for constructive possession of methamphetamine or, alternatively, with possession of chemical precursors to methamphetamine, which is prohibited by Indiana Code § 35-48-4-14.5(c). Arrest for the former would have required that the Detective have probable cause to believe that Ms. Wheeler had constructive knowledge of the methamphetamine found in the garage, a premise that we have rejected. Arrest for possession of chemical precursors to methamphetamine requires proof that the defendant possessed those precursors with the intent to manufacture methamphetamine. *Id*. The record does not disclose any evidence from which the Detective could have inferred that Ms. Wheeler intended to manufacture methamphetamine.

638-39 (1987). The defense provides "ample room for mistaken judgments" and protects all but the "plainly incompetent and those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996). Qualified immunity protects those officers who make a reasonable error in determining whether there is probable cause to arrest an individual. *Anderson*, 483 U.S. at 643; *Belcher v. Norton*, 497 F.3d 742, 749 (7th Cir. 2007). The Supreme Court of the United States has articulated a two-part test for qualified immunity: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[10]

Although qualified immunity is an affirmative defense, *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001), once the defense is raised, it becomes the plaintiff's burden to defeat it, *Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007); *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999). A plaintiff may defeat a qualified immunity defense by "point[ing] to a clearly analogous case establishing a right to be free from the specific conduct at issue" or by

---

[10] The Supreme Court recently granted certiorari to consider whether the two-step approach required under *Saucier v. Katz*, 533 U.S. 194, 201 (2001), should be overruled. *Pearson v. Callahan*, 128 S. Ct. 1702, 1702-03 (2008) (directing the parties to "brief and argue the following question: 'Whether the Court's decision in *Saucier v. Katz*, 533 U.S. 194 (2001) should be overruled?' ").

showing that "the conduct [at issue] is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001). Because we have determined that Detective Lawson arrested Ms. Wheeler without probable cause, thus violating her Fourth Amendment right to be free from unlawful arrest, we shall focus on the second prong of the *Saucier* test.

Ms. Wheeler contends that Detective Lawson is not entitled to qualified immunity, but she does not point to case law that would have given fair warning to a reasonable officer in the Detective's position that his "conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *see also Hope v. Pelzer*, 536 U.S. 730, 740-41 (2002) (noting that "officials can still be on notice that their conduct violates established law even in novel factual circumstances," but explaining that "the state of the law" nevertheless must provide "fair warning" that their conduct was unconstitutional). Instead, Ms. Wheeler contends that no police officer would have believed, reasonably although mistakenly, that there was probable cause to arrest her for maintaining a common nuisance.

We believe that the probable cause determination here was sufficiently close that an officer reasonably could have believed that probable cause existed, even if that belief ultimately was mistaken. *See Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987) ("[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present."); *Sorenberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1014 (7th

Cir. 2006) ("[W]e recognize that, even if probable cause is lacking with respect to an arrest, the arresting officer is entitled to immunity so long as his belief that he had probable cause was objectively reasonable."); *Kijonka v. Seitzinger*, 363 F.3d 645, 648 (7th Cir. 2004) (noting that, after determining that probable cause does not exist, "the question for us is whether there was any reasonable basis to suppose there was probable cause, as that is the test for qualified immunity").

Detective Lawson found a significant number of items used to produce methamphetamine in Ms. Wheeler's garage. After the fire, Ms. Wheeler's cousin, Rusty Dillard, was discovered inside the garage along with a bag containing methamphetamine, and the Detective learned that Ms. Wheeler's husband and her other cousin, Mark Dillard, had spent the entire day at the garage. Detective Lawson and other officers at the scene, furthermore, attached great—albeit undue—significance to the fact that the area surrounding the garage was outfitted with a surveillance system. These circumstances provided a reasonable, although ultimately mistaken, basis for Officer Lawson to believe that Ms. Wheeler was aware of the activities taking place in the garage. Although Detective Lawson could have conducted a more thorough investigation under the circumstances, given the information that he knew and given that the burden is on Ms. Wheeler to defeat his qualified immunity defense, we cannot conclude that a reasonable officer could not have believed that there was probable cause to arrest Ms. Wheeler for maintaining a common nuisance.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED