In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 09-1098 & 09-1101

GINA PURVIS,

*Plaintiff-Appellee,*

*v.*

DANIEL OEST; PATRICIA LUNN;
GARY VICINI; and DOUGLAS BERNABEI,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Central District of Illinois.
No. 05-1348—**Michael M. Mihm**, *Judge.*

ARGUED NOVEMBER 12, 2009—DECIDED AUGUST 2, 2010

Before CUDAHY, MANION, and WILLIAMS, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Gina Purvis was a high-school teacher, who was suspected of having a sexual relationship with her then-15-year-old biology student, "M.R.". The school conducted an investigation in which Gary Vicini, the dean of students, played a leading role. This created a potential conflict of interest, since Vicini had

himself been accused by Purvis of sexually harassing a student a year previously. After Vicini threatened M.R. with expulsion and possible jail time should he continue to deny his having had an affair with Purvis, the student capitulated and admitted the existence of such a relationship. The school district's superintendent, Daniel Oest, then reported the allegations to the police. The chief of the Spring Valley Police Department, Douglas Bernabei, notified the Department of Child and Family Services (DCFS). Both began investigating. The DCFS investigator, Judith O'Brien, ultimately recommended that Purvis be indicated as a sexual perpetrator. Purvis was indicted by a grand jury and arrested on December 15, 2004.

After being acquitted following a bench trial, Purvis brought suit against Vicini, Oest, the school principal, Patricia Lunn and Bernabei, among others. In relevant part for the present appeal, she alleged deprivation of due process and false arrest. The district court declined to grant summary judgment in favor of the defendants. It found that the school defendants lacked qualified immunity and that a reasonable jury could find facts sufficient to amount to a deprivation of due process. With respect to the alleged false arrest, the district court determined that, "by the slimmest of margins," Purvis had demonstrated a genuine issue of material fact as to whether Bernabei had probable cause. It also found that qualified immunity did not protect Bernabei in the circumstances.

For the reasons that follow, we reverse the district court's holding as to Bernabei, finding that sufficient

evidence to establish probable cause existed as a matter of law. We also conclude that the district court erred in finding that Oest, Vicini and Lunn are not protected by qualified immunity.

## I. BACKGROUND

Whispers of an illicit, sexual relationship between a teacher, Gina Purvis, and her then-15-year-old student, M.R., began circulating in the spring of 2004 at Hall High School District 502 in Spring Valley, Illinois. They were questioned by Patricia Lunn, the principal, but both M.R. and his teacher denied the veracity of the rumors. The gossip returned anew the following semester, which prompted school officials to act. The superintendent, Daniel Oest, and the principal decided that an investigation was in order, which would be carried out by Oest and Gary Vicini, the dean of students.

The rumors obviously concerned a matter of the utmost importance. Schools are mandatory reporters under Illinois law, such that they must report suspected child abuse immediately to the DCFS if they have "reasonable cause to believe" that such abuse took place. 325 ILL. COMP. STAT. 5/4. Given the circumstances, some inquiry to determine whether there was any semblance of truth to the rumors was surely advisable.

The investigation was stymied by an extraordinary defect, however, for one of the investigators, Vicini, had himself been accused by Purvis of sexually harassing a female student the year before. Moreover, Vicini had

been informed that Purvis was the person who had reported him. Obviously, it would be unsurprising if Vicini harbored some form of resentment toward Purvis. The school principal, Lunn, was aware of this conflict of interest, yet said nothing. Throughout the ensuing investigation, Oest, the superintendent, remained unaware of the potential bias on Vicini's part.

On November 10, 2004, Oest and Vicini interviewed M.R., who twice denied having had any sexual relationship with Purvis. The following fact is of considerable importance to the present appeal: there is evidence that Vicini, biased as he may have been against Purvis, threatened M.R. with expulsion and even imprisonment should he continue to deny the existence of the relationship. The student asked whether the matter would be kept confidential, which Oest assured him would be the case. The school's official policy, however, was only to keep such statements confidential "to the extent possible given the need to investigate."

M.R. then changed his story, recounting myriad details about his alleged relationship with Purvis. He wrote a statement in which he indicated that he and Purvis had gotten closer to one another in January 2004, that, in February, the two had kissed at school and had engaged in sexual activity in her house, her car and his house, that some similar activity took place in May, but that later that month she told him that they needed to slow down. He contended, however, that on September 2 she kissed him again.

After obtaining this statement, Oest attempted, but was unable, to contact Purvis, since she didn't answer her cell

phone. He then contacted local law enforcement and informed Douglas Bernabei of the Spring Valley Police Department of what had transpired. Bernabei then contacted DCFS, which appointed Judith O'Brien to conduct an inquiry on its behalf. No one informed either Bernabei or O'Brien of Vicini's potential conflict of interest. Nor were they informed of the pressure that Vicini had exerted on M.R., or that he had purportedly induced the student to change his story.

Bernabei met with Oest the very same day, where Bernabei was informed of the rumors and read M.R.'s written statement. Bernabei then met with M.R.'s mother, who told him that she had suspected something was going on between Purvis and her son. She also told Bernabei that her son had informed her of his sexual encounters with Purvis earlier that day. M.R.'s mother also explained that Purvis had previously mentioned rumors of a fling, which the teacher denied, saying that she was merely mentoring the boy.

Bernabei then interviewed M.R., who explained that Purvis initiated what ultimately became a mutual French kiss in a lab-storage area of the classroom on February 9, 2004. M.R. told Bernabei that this encounter preceded his first sexual one with Purvis a few days later and that he and his teacher had sex two to three times per week during February, March and April of 2004. He recounted myriad, specific details of the sexual acts in which the two engaged. On one of these occasions, he purported to have had "intercourse nine different times." M.R. also said that Purvis had shown him a vibrator

that she kept in her dresser drawer. M.R. also told Bernabei that his cousin, Rick Andes, while on leave from the Navy, picked him up from Purvis's house. M.R. said that, while there, Andes had seen M.R. and Purvis kissing. In addition, M.R. described a variety of gifts that Purvis had given him, which included a baseball necklace, numerous photos and an Old Navy shirt.

M.R. explained that the sexual relationship had ended by late April or early May, but that he and Purvis stayed in contact by phone and internet over the summer. At the start of the fall semester, he and Purvis exchanged a couple of kisses. Finally, he informed Bernabei that he had told some of his fellow students at school that the rumors were true.

Bernabei proceeded further into this investigation, which involved listening in on a phone call between M.R.'s mother and Purvis, obtaining telephone records, interviewing some of M.R.'s fellow students and meeting M.R.'s cousin to corroborate the former's statements. These facts are developed below, as necessary to our analysis. Through his investigation, Bernabei also unearthed some exculpatory evidence. This, too, is explored below.

Purvis was indicted by a grand jury and arrested on December 15, 2004. On October 20, 2005, Purvis and the school district entered into an agreement pursuant to which she voluntarily resigned her employment in exchange for $43,000. On October 31, 2005, Purvis was acquitted of all charges after a bench trial. She then brought the present lawsuit, alleging in relevant part

deprivation of due process and false arrest. Oest, Lunn, Vicini and Bernabei all moved for summary judgment, which the district court denied in part relevant for this appeal. The court found that none of the defendants was entitled to qualified immunity. It also determined that there were genuine issues of material fact as to whether Oest, Lunn and Vicini deprived Purvis of due process by giving Vicini a leading role in the school investigation and as to whether Bernabei had probable cause to arrest the plaintiff.

For the reasons that follow, we reverse the district court and find that Oest, Lunn, Vicini and Bernabei are entitled to summary judgment.

## II. DISCUSSION

We review a district court's denial of summary judgment de novo. *See Sullivan v. Ramirez*, 360 F.3d 692, 696 (7th Cir. 2004). We similarly review a trial court's denial of a defendant's claim of qualified immunity de novo. *See Finsel v. Cruppenink*, 326 F.3d 903, 906 (7th Cir. 2003). Although qualified immunity is an affirmative defense, once raised, it becomes the plaintiff's burden to defeat it. *See Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008). In a qualified-immunity setting, the plaintiff bears the burden of showing that the constitutional right allegedly violated was clearly established at the time of the challenged conduct. *See Landstrom v. Ill. Dep't of Children & Family Servs.*, 892 F.2d 670, 675 (7th Cir. 1990). Such a plaintiff can also prevail by showing that "the conduct [at issue] is so egregious that no reasonable

person could have believed that it would not violate clearly established rights." *Wheeler*, 539 F.3d at 639 (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)).

### A. A Genuine Issue of Material Fact Exists as to Whether the School's Investigation Was Biased and Deprived Purvis of Due Process

Purvis contends that her due-process rights were violated by Vicini's pressuring M.R. into changing his story and admitting the existence of a sexual relationship. Purvis submits that Vicini exerted such pressure because he held a fundamental animus against her, due to her having previously reported him for sexual harassment. She argues that his bias against her resulted in a constitutional deprivation.

The first question is whether the record, viewed in the light most favorable to Purvis, reveals a genuine issue of material fact as to whether Vicini was biased against her. We have no difficulty finding that it does. It is axiomatic that an individual accused of sexual harassment by a fellow teacher, and who was informed of the identity of the accuser, might harbor some resentment against that accuser. Although Vicini denies holding a grudge against Purvis, this raises a question of fact for the jury.

Thus, given the summary-judgment posture, we find that the evidence supports a finding that Vicini was biased against Purvis. In light of this determination, it is troubling indeed that the principal, Lunn, would place Vicini in a position in which he exercised at least some

influence over the course of the school investigation. Again viewing the record in the light most favorable to the non-moving party, the evidence amply supports a jury finding that Vicini exerted great pressure over M.R. to admit the existence of a sexual relationship with Purvis. It is a legitimate inference that Vicini may have been spurred to exercise this pressure in some part by his dislike of Purvis.

We have previously recognized that "fundamentally biased process is not *due* process." *Levenstein v. Salafsky*, 164 F.3d 345, 352 (7th Cir. 1998) (emphasis original). In light of our preceding determination as to Vicini's potential bias and influence over the school investigation, it is fair at the summary-judgment juncture to characterize the school's investigation of Purvis as fundamentally biased.

However, a lack of process does not necessarily translate into a constitutional violation; rather, it must be tied to a protected interest. It is well established, however, that a person has a liberty interest to pursue employment in her chosen field and that this interest is violated when a state actor casts doubt on that individual's good name or reputation such that it becomes virtually impossible for her to find new employment in that field. *See Townsend v. Vallas*, 256 F.3d 661, 669-70 (7th Cir. 2001); *Strasburger v. Board of Education*, 143 F.3d 351, 356 (7th Cir. 1998). It is also the case that a tenured employee has a property interest in his job. *Levenstein*, 164 F.3d at 351.

Oest, Lunn and Vicini go to some length to emphasize that they did not owe Purvis due process before alerting

the DCFS of her suspected child abuse. They observe that such reporting does not deprive the suspected abuser of an interest in pursuing her chosen profession. Instead, they point out, it is the DCFS's decision to indicate a person as a sexual abuser that effects a deprivation. This is a potentially important point, and we therefore address it in some detail.

First, and as an observational matter, Oest did not in fact report Purvis to the DCFS; instead, he informed the police department, which in turn notified the DCFS. If we nevertheless treated his reporting Purvis to the police as equivalent to notifying the DCFS, we agree that such action would not in itself amount to a constitutional deprivation. This holds true despite the current wording of Illinois's Abused and Neglected Child Reporting Act (ANCRA), which provides that:

> if an employee of a school district has made a report or caused a report to be made to the Department under this Act involving the conduct of a current or former employee of the school district and a request is made by another school district for the provision of information concerning the job performance or qualifications of the current or former employee because he or she is an applicant for employment with the requesting school district, the general superintendent of the school district to which the request is being made must disclose to the requesting school district the fact that an employee of the school district has made a report involving the conduct of the applicant . . . .

325 ILL. COMP. STAT. 5/4. Under this provision, it is conceivable that a school's reporting a teacher to the DCFS could constitute a deprivation insofar as it wreaked havoc on a person's ability to find new employment in his chosen field. One can only imagine that a person who had been accused of such abuse would not wish to remain a part of her current school in the future. Yet, any attempt to apply for a job with a different district would likely be frustrated when the other school sought information concerning the applicant.[1]

Ultimately, however, we do not address this issue, in light of the fact that the above-quoted language was added to the statute after the events in the present case took place. Moreover, there is no evidence in the record that the act of reporting under ANCRA to the DCFS alone has such a negative, de facto effect on a teacher's reputation that she is thereby rendered incapable of pursuing her chosen career. Absent such evidence, and because the quoted language in Section 4 was not operative at the time of the acts giving rise to the present case, Oest, Lunn and Vicini's act in causing Purvis to be

---

[1] Even if we had to reach this question, however, it would be far from clear that reporting would give rise to a deprivation. This is because Section 4 provides that the fact that a report had been made "may be disclosed only in cases where the employee and the general superintendent have not been informed by the Department that the allegations were unfounded." 325 ILL. COMP. STAT. 5/4. The negative impact of a report under ANCRA is therefore ephemeral if the DCFS determines that the allegations were unfounded.

reported to the police, and indirectly to the DCFS, did not in itself effect a deprivation.

This is not the end of the matter, however. Instead, we must grapple with the possibility that the potentially biased nature of the school's investigation corrupted the integrity of the subsequent investigations by the DCFS and Chief Bernabei, essentially as found by the district court.

Oest, Lunn and Vicini contend that the ensuing investigations by O'Brien and Bernabei were sufficiently independent as to afford Purvis the requisite due process before any deprivation occurred. They appeal to our prior decision in *Trejo v. Shoben*, where we held that even if the initial investigator in that case were "brimming over with animosity . . . [his] reasoning and recommendation to terminate probationary employee Trejo was reviewed by two separate, independent faculty committees which conducted their own investigations of the charges and likewise came to the conclusion that Trejo's misconduct warranted his removal from the faculty." 319 F.3d 878, 888 (7th Cir. 2003). In the same way, Oest, Lunn and Vicini argue, the investigations by Bernabei and O'Brien were wholly independent. None of the school officials assisted with the police and DCFS investigations.

It is a factual question whether the DCFS and the police investigations were sufficiently independent as to cure any due-process deficiency in the earlier inquiries conducted by the school. There is certainly sufficient evidence for a jury to answer this question in the affirmative, given the considerable inculpatory evidence uncov-

ered by Bernabei, which is detailed above, and the fact that O'Brien participated in a second interview of M.R. Nevertheless, viewing the facts in the light most favorable to Purvis, we find that a reasonable jury could find that the investigations conducted by O'Brien and Bernabei were not sufficiently independent to cure any constitutional infirmity inherent in the school's original investigation. Unlike in *Trejo*, where the independent faculty committees were apprised of all relevant facts, there is no evidence in the record that either O'Brien or Bernabei was made aware of Vicini's potential bias and his role in pressuring (arguably intimidating) M.R. into providing the inculpatory statement that started the ball rolling. We believe that a jury is best placed to resolve the factual questions presented here.

We therefore conclude that the record, when viewed in the light most favorable to the plaintiff, reveals a genuine issue of material fact as to whether the school's investigation (1) was fundamentally biased and (2) deprived Purvis of her protected liberty interest in her employment by corrupting the DCFS and police investigations, which ultimately resulted in her losing her job and ongoing ability to work as a teacher. In this regard, the district court is sustained. The remaining question concerns Oest, Vicini and Lunn's right to qualified immunity.

## B. Oest, Vicini and Lunn Are Entitled to Qualified Immunity

Oest, Vicini and Lunn contend that they are entitled to qualified immunity, which protects government officials

from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). We apply a two-part test to determine whether the doctrine attaches: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Supreme Court has made clear that the doctrine of qualified immunity provides "ample room for mistaken judgments" and protects all those but the "plainly incompetent and those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

We have already concluded that there exists a genuine issue of material fact as to whether Vicini harbored a bias against Purvis that led to corruption of the integrity of the school's initial inquiry and the DCFS and the police department's follow-up investigations. Thus, the facts taken in the light most favorable to the plaintiff demonstrate that Oest, Vicini and Lunn violated a constitutional right. This raises the question whether a reasonable person in Oest, Vicini or Lunn's position would have known he was violating Purvis's clearly established federal rights in (a) knowingly allowing a biased person to play a leading role in the initial investigation, which ultimately resulted in the biased individual's threatening the suspected victim into admitting the

existence of a relationship, (b) reporting the suspected crime to the police, (c) providing the police with the supposed victim's written statement, which detailed the specifics of the boy's alleged affair with the teacher, but (d) not informing the police or DCFS of the conflict of interest and that the student's statement had been provided only after the potentially biased person exerted considerable pressure, which led the student to drop his denials.

Oest was not aware of the potential conflict of interest involving Vicini. It is clear therefore that a reasonable person in his situation would not have known that appointing Lunn and Vicini to investigate the veracity of the rumors would have involved a fundamentally biased process, thus violating a clearly established constitutional right. Oest is therefore entitled to qualified immunity.

Despite being aware of the potential conflict of interest, Lunn and Vicini are also entitled to qualified immunity. The district court correctly observed that there was clearly established federal law at the time of reporting Purvis that fundamentally biased process is not due process. *See Levenstein*, 164 F.3d at 351. It was also well established that a person has a protected interest in pursuing employment in her chosen field. *See Dupuy v. Samuels*, 397 F.3d 493, 503-04 (7th Cir. 2005). But this high-level observation is insufficiently precise for the specific circumstances in which Lunn and Vicini found themselves. There is no case law of the U.S. Courts of Appeals or Supreme Court of which we are aware that demonstrates that Purvis's constitutional rights would have

been violated by reporting her to a body that would perform an independent investigation before effecting a deprivation. Although we have found that there is a genuine issue of material fact whether the ensuing investigation by the DCFS was sufficiently independent to cure any due-process deficiency, Lunn and Vicini would not have been plainly incompetent to suppose in light of our decision in *Trejo* that the subsequent, independent DCFS investigation would have foreclosed any constitutional violation. For this reason, we find that Lunn and Vicini are similarly entitled to qualified immunity and, hence, summary judgment.

It was clearly established that due process was denied by the introduction of a fundamental conflict of interest into the investigative process. But it was not clearly established that such a procedural defect violated the Constitution if whatever conclusion eventuated was subject to confirmation and validation by a subsequent independent investigation. This distinction may be subtle, but here it is decisive.

## C. Bernabei Had Probable Cause to Arrest Purvis

The last question we address is whether Bernabei's arresting Purvis is protected by the doctrine of qualified immunity. We apply the same two-part test already discussed; namely to determine whether the doctrine attaches, we ask: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time

of the alleged violation. *Wheeler*, 539 F.3d at 639 (citing *Saucier*, 533 U.S. at 201).

Studying the record, it is clear that Bernabei uncovered sufficient evidence to justify his arresting Purvis. The first question in addressing a qualified-immunity defense concerns the merit of the underlying constitutional claim. *Norfleet v. Webster*, 439 F.3d 392, 395 (7th Cir. 2006). Even viewing the evidence in the light most favorable to Purvis, Bernabei had probable cause to arrest her. Therefore, her constitutional rights were not violated. *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). Bernabei is thus entitled to protection under the doctrine of qualified immunity. *Akande v. Grounds*, 555 F.3d 586, 590 (7th Cir. 2009).

Bernabei uncovered considerable evidence of Purvis's having had an illegal, sexual relationship with her student. First, Bernabei read M.R.'s written report, which recounted in considerable detail the substance of his illicit relationship with his teacher. Second, the police officer met with M.R.'s mother, who told him that she had suspected something was going on between her son and Purvis. Bernabei was also informed that M.R. had told his grandmother that he and Purvis had kissed and that Purvis had told him that she loved him. Fourth, on November 16, 2004, Bernabei conducted an in-person interview of M.R., whose ensuing account of his affair with Purvis was consistent with his prior statement. Fifth, the officer arranged with the U.S. Navy that Rick Andes, a witness who was onboard a submarine, would be kept *ex communicado* until Bernabei spoke with him. When

Bernabei spoke with Andes by phone, the latter gave an account that was largely consistent with M.R.'s as to what had transpired one evening in late February/early March 2004. Andes explained that he had driven to Purvis's home that evening to pick up M.R., that he had seen Purvis and M.R. French kiss and that Purvis had said that M.R. was a "good lay" or was "good in bed." Andes also accurately described Purvis's home.

The preceding evidence consisted of a victim's statement, which the arresting officer perceived to be credible and which was independently verified in material part by an independent witness. Yet, this was not the only evidence that Bernabei uncovered before making an arrest. M.R.'s mother phoned Purvis on November 11, 2004, and allowed Bernabei to listen in without making his presence known. Purvis adamantly denied having had sexual intercourse with M.R., but admitted that she loved him (in a platonic way), that M.R. had been at her house on two occasions while her husband was away and that she had told M.R. to lie to his parents about his being there,[2] that she had danced with M.R. at homecoming and that she had inadvertently shared a kiss with M.R., which he initiated and had caught her by surprise and that she had "messed up" by getting too close to him.

---

[2] In deposition testimony in August, 2007, Purvis denied that she had instructed M.R. to lie. However, this testimony occurred after Bernabei arrested her on December 15, 2004, and so does not go to whether the police officer had probable cause when he arrested her.

Bernabei uncovered yet more evidence when he subpoenaed M.R.'s and Purvis's telephone records. They revealed that the teacher and student had exchanged in excess of 500 phone calls between January 18 and May 7, 2004. Some of these calls occurred in the early hours of the morning. On Valentine's Day, they exchanged 20 phone calls, which amounted to three hours' speaking time. In addition to this evidence, Bernabei also spoke with a number of students, who gave varying accounts of the truth of the rumors. He also corroborated the purchase of gifts that M.R. and Purvis had supposedly given each other.

Probable cause requires only that a probability or a substantial chance of criminal activity exist. *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003); *Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 679 (7th Cir. 2007). The evidence need not show that the officer's belief is more likely true than false. *Hughes v. Mayer*, 880 F.2d 967, 969 (7th Cir. 1989). In light of the preceding, undisputed evidence, it seems inescapable to us that this standard is satisfied. Bernabei had a written and highly detailed statement from the alleged victim, which the latter later echoed in a taped interview and which was independently corroborated by a witness who could not have been coached. This inculpatory evidence was bolstered by considerable circumstantial evidence. We find that it easily meets the standard of probable cause.

The district court gave short shrift to the preceding, undisputed evidence, focusing instead on evidence uncov-

ered by Bernabei that potentially served to undermine the inculpatory evidence. The court was, of course, correct to construe all contested evidence in the light most favorable to the non-moving party and also to draw all reasonable inferences from undisputed facts in the light most favorable to the nonmoving party. *Harney v. Speedway SuperAmerica, L.L.C.*, 526 F.3d 1099, 1104 (7th Cir. 2008). But even viewed in this light, the record could not support a jury finding that Bernabei lacked probable cause. Ultimately, the district court overstepped in finding that Purvis had "by the barest of margins" presented a genuine issue of material fact as to whether Bernabei had probable cause.

In considering the factors that proved controlling to the district court, it is worth emphasizing that there is a difference between evidence of the kind that negates proof beyond a reasonable doubt and that which is so significant as to undo the existence of probable cause. As noted above, the evidence required to establish probable cause is considerably less than that required to sustain a criminal conviction. *See Braun v. Baldwin*, 346 F.3d 761, 766 (7th Cir. 2003) ("Probable cause is not proof beyond a reasonable doubt, or even proof by a preponderance of the evidence."). Ultimately, of course, the exculpatory evidence unearthed proved sufficient to earn Purvis an acquittal following a bench trial. But as we now explain, it did not result in Bernabei's lacking probable cause to arrest Purvis.

The first factor relied upon by the district court was that Bernabei knew that M.R. had initially denied the rumors

when questioned by school officials. This, of course, is relevant evidence going to the question of Purvis's guilt, but this fact's impact should not be exaggerated. After all, a student's initial hesitancy to reveal the story of his illicit affair with a teacher should hardly be surprising. While it is exculpatory, it hardly suffices to undo the fact of probable cause when viewed in light of the extensive inculpatory evidence discussed above. *See Spiegel v. Cortese*, 196 F.3d 717, 724-25 (7th Cir. 1999).

Second, the district court noted evidence that Bernabei knew that M.R. was working as a paid police informant. This injects a further twist into an already bizarre case and could certainly evidence possible bias. But standing alone, and even viewed in the light most favorable to Purvis, it does not negate the existence of probable cause, which does not even require "proof [of guilt] by a preponderance of the evidence." *Braun*, 346 F.3d at 766. Even if one discounts the reliability of M.R.'s statements, it bears noting that certain, important details of those statements were corroborated by a third party, Andes. There is also the significant matter of the voluminous circumstantial evidence of an improper relationship, from the telephone records to Purvis's own admissions on the phone to M.R.'s mother.

Third, the district court put weight on the fact that M.R. lied to Bernabei about not contacting Purvis after his November 10, 2004 interview with the police officer. Indeed, evidence suggests that M.R. contacted her the very same day as his interview and then again on November 15 to warn her that he had told the police that they

had had a sexual relationship. This clearly goes to M.R.'s credibility, but it seems to us that this evidence might be more accurately characterized as impeaching, rather than exculpatory. In light of the strong, inculpatory evidence discussed above, the victim's impulse to protect the teacher with whom he may have had an affair cannot fairly be said to nullify probable cause.

Fourth, the district court found fault with Bernabei's reporting of the contents of the telephone conversation between M.R.'s mother and Purvis. Specifically, the court observed that Bernabei "reported the contents of the conversation in a way that cast the conversation as corroborative of a sexual relationship." Yet, Bernabei's report began by noting that Purvis had repeatedly denied having sexual intercourse with M.R. In any event, many details unearthed during this particular phone conversation suggest an inappropriate relationship between M.R. and Purvis, such as her admitting that they had kissed, her inviting him to her house while her husband was away and her telling him to lie to his parents about it. The substance of the phone call, it would seem to us, added to rather than detracted from the evidence supporting probable cause to arrest Purvis.

Next, the court focused on M.R.'s somewhat implausible claim that he "came" nine times in the course of a few hours while having sex with Purvis. Evidence exists that Bernabei told M.R. that this claim was incredible a month or two before trial. The district court thought that this conversation, viewed in the light most favorable to Purvis, suggests that Bernabei did not find this claim

to be reliable prior to his arresting the plaintiff. This evidence could of course be used to impeach M.R., but implausible boasts of sexual prowess by a teenage boy would hardly be unprecedented. A reasonable police officer could discount such an assertion as hyperbolic grandstanding, while still finding credible the underlying claim of interest, namely that M.R. and Purvis had had a sexual relationship.

Sixth, the district court was concerned with Bernabei's reporting of his interviews with various students at Hall High School concerning their views on the accuracy of the rumors that had circulated about M.R. and Purvis. Specifically, Bernabei's report omitted non-corroborative information, such as some students' denials of a sexual relationship between the two, one student's statement that M.R. had said that he was going to get Purvis for what she had done to him and Oest's note that "[p]eople made up stuff." While selective reporting is certainly problematic, at least two factors lead us to believe that the evidence obtained from the students was not sufficiently exculpatory as to nullify probable cause. First, one might reasonably question the reliability of high-school-student testimony as to the validity of circulating rumors. Second, the fact that some students believed the rumors and some did not does not undo the significant inculpatory evidence Bernabei unearthed from other sources.

Seventh, evidence existed that M.R. had stolen the plaintiff's internet, instant-messaging password and had used it to impersonate Purvis in conversations with

Purvis's mother to obtain personal information. There was also evidence that Purvis had spoken in class about the location and design of her tattoo, such that M.R.'s knowledge of it did not necessarily show that he had had intimate relations with her. Moreover, some evidence suggests that M.R. had found out about Purvis's vibrator from a fellow student who had accidentally discovered it while babysitting for Purvis's daughter. In addition, Purvis complained that some of her personal effects had been stolen from her desk at school. Construing this evidence in the light most favorable to Purvis, in conjunction with the undisputed facts in the record, it does not follow that Bernabei lacked probable cause. It certainly goes some way toward establishing a reasonable doubt as to Purvis's guilt, but M.R.'s specific testimony, corroborated by an independent witness, and buttressed by considerable circumstantial evidence in the form of phone records and otherwise, establishes a substantial chance that criminal activity had occurred. *Beauchamp*, 320 F.3d at 743.

The last factor relied upon by the district court involved perceived shortcomings in Bernabei's investigation. These involved his failure immediately to investigate the classroom storage area where M.R. and Purvis supposedly first had sex, his delay in searching Purvis's home and computer and his failure to examine M.R.'s home computer. With respect to the storage area, Bernabei aptly points out that the sexual encounter was alleged to have taken place more than half a year before. It is not clear what kind of evidence one would expect to find after

such an interval. With respect to the computers and home search, it would seem that the district court may have envisioned a flawless and fully comprehensive investigation's being a prerequisite to Bernabei's having probable cause to arrest Purvis. Such is clearly not the case, for we have long recognized that "the law does not require that a police officer conduct an incredibly detailed investigation at the probable cause stage." *Gerald M. v. Connelly*, 858 F.2d 378, 381 (7th Cir. 1988).

Ultimately, no investigation is perfect, but given the totality of the circumstances, the record makes clear that Bernabei had probable cause to arrest Purvis, even when it is viewed in the best possible light for her. To find otherwise on the record before us would be to subject police officers to "potentially disabling threats of liability." *Tangqwall v. Stuckey*, 135 F.3d 510, 514 (7th Cir. 1998).

We note in closing that, even if we were wrong in this regard and Bernabei in fact lacked probable cause to arrest Purvis, a reasonable officer could have believed that probable cause existed, even if that belief were ultimately mistaken. *See Wheeler*, 539 F.3d at 639. A police officer faced with the evidence unearthed by Bernabei could not be characterized as "plainly incompetent" in concluding that probable cause existed to arrest Purvis. *Id.*; *see also Malley v. Briggs*, 475 U.S. 335, 349 (1986). Even on this alternative ground, then, Bernabei is entitled to qualified immunity.

## CONCLUSION

The present case involves a most unfortunate series of events that raise a variety of challenging legal and factual questions. We agree with the district court that plaintiff has raised a genuine question of material fact whether the school's appointment of a potentially biased individual to investigate the rumors involving Purvis and M.R. so fundamentally corrupted the ensuing investigation as to amount to a due-process violation. Perhaps, if given the occasion, a jury would determine that Vicini did not in fact harbor resentment against Purvis and that the school investigation was carried out in a neutral fashion. It is also possible, and perhaps even likely, that a jury would find the police and DCFS investigations to be sufficiently independent that any conceivable bias in the initial, school investigation was neutralized. But the important point is that both issues require determinations involving contested issues of fact and these are within the exclusive province of the jury.

Nevertheless, the district court erred in concluding that Oest, Vicini and Lunn are not entitled to qualified immunity. It is clear that the superintendent, Oest, is so entitled because he was not aware of any conflict of interest. As for Vicini and Lunn, there was no federal law clearly establishing that a biased person causing a teacher to be reported to the police, DCFS or similar entity would violate her constitutional rights when that entity would conduct an independent investigation to determine the validity of the accusation against her. Vicini and Lunn are therefore entitled to qualified immunity and, hence, summary judgment.

Finally, the record in the present case, even viewed in the light most reasonable to the plaintiff, establishes that Bernabei had probable cause to arrest Purvis as a matter of law and that there was no constitutional violation. Thus, we reverse the district court's decision not to grant summary judgment in favor of Bernabei.

The judgment of the district court is therefore

REVERSED.