**Louis K. FLOYD, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 77A01–0212–CR–489.**

Court of Appeals of Indiana.

July 8, 2003.

Susan K. Carpenter, Public Defender of Indiana, David P. Freund, Deputy Public Defender, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Christopher C.T. Stephen, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Louis K. Floyd appeals his convictions for Dealing in Methamphetamine, as a Class B felony, Possession of Chemical Reagents or Precursors With Intent to Manufacture Methamphetamine, as a Class D felony, and Possession of Methamphetamine, as a Class D felony, following a jury trial. He raises the following issues for review:

1. Whether the State presented sufficient evidence to sustain his convictions.

2. Whether his possession of precursors conviction is a lesser included offense of his dealing conviction.

We affirm.

### FACTS AND PROCEDURAL HISTORY

On March 21, 2002, Sullivan County Sheriff's Deputy Carl Melchart responded to an anonymous tip regarding a strong odor of ether, a chemical associated with the production of methamphetamine, on Wooley Street in Paxton. Deputy Melchart determined after investigation that the ether odor was strongest near a mobile home at 4261 Gum Street. After he ran a license plate check on the vehicle parked in front of the mobile home, he discovered that the registered owner of the vehicle was Rhonda Davis. Chief Deputy James Goodwin watched the residence while Deputy Melchart left to obtain a search warrant. While Chief Deputy Goodwin waited for Deputy Melchart to return, he observed a man wearing a flannel shirt walking around in the back yard of the residence.

When Deputy Melchart returned with a search warrant, he, Chief Deputy Goodwin, and Deputy William Snead knocked on the mobile home door. Davis answered, and the officers asked her whether there was anyone else inside the mobile home. Davis replied, "no," but Deputy Goodwin noticed the same flannel shirt he had seen worn by the man walking outside hanging on a chair inside the mobile home. Deputy Goodwin asked Davis where the man was who had been wearing the flannel shirt, and she stated that she did not know. The officers entered the mobile

home, and Deputy Snead eventually found Floyd hiding underneath a bed in the bedroom.

The mobile home smelled of ether, and the officers found a yellow pitcher containing what they believed to be ether. The home was in disarray, and the officers found the following items scattered throughout the kitchen and living room area: approximately 500 pseudoephedrine pills, two lithium batteries, nine empty starter fluid cans with holes punched in the bottoms, isopropyl alcohol, muriatic acid, coffee filters, hydrochloric generators, table salt, a coffee grinder with ephedrine residue on it, a digital scale, plastic baggies, plastic ties, and various glass and plastic containers with residue in them. In the backyard, the officers found a thermos that field-tested positive for anhydrous ammonia. In the living room of the home, the officers also discovered a green pen casing, often called a "snort tube," which contained a powdery residue that later tested positive for methamphetamine. Transcript at 128. It was clear to all of the officers at the scene that the mobile home was being used as a methamphetamine lab.

In addition to the drug-related evidence, the officers found a pair of Floyd's jeans in the mobile home, which contained his wallet. Inside the wallet, the officers retrieved Floyd's identification card and what appeared "to be a recipe for how to make methamphetamine." *Id.* at 48.[1] When the officers placed both Floyd and Davis under arrest, Floyd stated that Davis had "nothing to do with this" and that "this wasn't her stuff." *Id.* at 71.

At trial, Paul Nelson, the owner of the mobile home and Floyd's ex-brother-in-law, testified that sometime in early March he had asked Floyd to stay in the mobile home while Nelson was recuperating from surgery. Nelson denied any knowledge of or involvement with the manufacturing of methamphetamine, and he could not identify many pieces of evidence taken from the mobile home which were depicted in photographs. Several of the State's witnesses, including Sullivan County Sheriff's Deputies, Indiana State Troopers, and an Indiana State Police analyst and forensic scientist, testified that, without a doubt, the mobile home was being used as a methamphetamine lab. Dan Colbert, an Indiana State Police Criminal Analyst, described how methamphetamine is manufactured and explained how each of the items recovered from the mobile home would be used in the manufacturing process.

The jury found Floyd guilty on all charges, and the trial court sentenced him to twenty years on the dealing conviction, three years on the possession of precursors conviction, and three years on the possession of methamphetamine conviction. The court ordered that Floyd serve all of his sentences concurrently. This appeal ensued.

## DISCUSSION AND DECISION

### Issue One: Sufficiency of the Evidence

Floyd first asserts that the State presented insufficient evidence to sustain his

---

1. State's Exhibit Number 33 contained a handwritten list of ingredients, including "AA Gas," lithium packs, ether, plastic and glass jars, 98% alcohol, liquid fire, filters, and a funnel. That document also contained step-by-step instructions regarding when and how to mix the ingredients. The last paragraph of the document provides:

Fill empty alchohal [sic] bottles ¼ ways with Fire[.] add 2 tsp of morton salt[.] put hose in bottle cap[.] put hose near liquid in short jars[.] after liquid quits turning white let it dry and scrape jars[.] continue until all is gassed. Let cure for a couple days. Clean up really good and keep the s**t low profile!

convictions. In particular, he alleges that the State failed to prove that he either actually or constructively possessed any of the evidence found at Nelson's mobile home. We must disagree.

When reviewing a claim of insufficient evidence, we consider only evidence that supports the verdict, and draw all reasonable inferences therefrom. *Warren v. State,* 725 N.E.2d 828, 834 (Ind.2000). We neither reweigh the evidence nor judge the credibility of witnesses. *Id.* We uphold a conviction if there is substantial evidence of probative value from which a jury could have found the defendant guilty beyond a reasonable doubt. *Id.* Circumstantial evidence alone is sufficient to sustain a conviction. *Id.*

A person who knowingly or intentionally manufactures methamphetamine commits dealing in methamphetamine, as a Class B felony. Ind.Code § 35–48–4–1(a)(1)(A).[2] A person who possesses two or more chemical reagents or precursors with the intent to manufacture methamphetamine commits a Class D felony. Ind.Code § 35–48–4–14.5(c)(2). And a person who, without a valid prescription or order of a practitioner acting in the course of the practitioner's professional practice, knowingly or intentionally possesses methamphetamine, commits possession of methamphetamine, as a Class D felony. Ind.Code § 35–48–4–6(a).

In *Bush v. State,* 772 N.E.2d 1020, 1022–23 (Ind.Ct.App.2002), *trans. denied,* this court held that the State presented sufficient evidence to prove that the defendant knowingly or intentionally manufactured methamphetamine where police found several items used to manufacture methamphetamine at the defendant's residence. Here, Floyd concedes that "there can be no doubt that the police found all the precursors, chemical reagents, and equipment in Nelson's trailer on March 21 necessary to manufacture methamphetamine." Brief of Appellant at 16. And he does not dispute that the officers discovered a small amount of methamphetamine inside a snort tube that was found in the mobile home. Accordingly, the dispositive question regarding all three of Floyd's convictions is whether the State presented sufficient evidence to prove that he constructively possessed the evidence recovered from Nelson's mobile home.

Constructive possession is established by showing that the defendant has both the intent and capability to maintain dominion and control over the contraband. *Person v. State,* 661 N.E.2d 587, 590 (Ind. Ct.App.1996), *trans. denied.* In cases where the accused has exclusive possession of the premises on which the contraband is found, an inference is permitted that he or she knew of the presence of contraband and was capable of controlling it. *Id.* However, when possession of the premises is non-exclusive, the inference is not permitted absent some additional circumstances indicating knowledge of the presence of the contraband and the ability to control it. *Id.* Among the recognized "additional circumstances" are: (1) incriminating statements by the defendant; (2) attempted flight or furtive gestures; (3) a drug manufacturing setting; (4) proximity of the defendant to the contraband; (5) contraband is in plain view; and (6) loca-

---

**2.** Indiana Code Section 35–48–1–18 defines "manufacture" as:

the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container.

tion of the contraband is in close proximity to items owned by the defendant. *Id.*

Floyd did not have exclusive possession over Nelson's mobile home. However, the State presented evidence of additional circumstances which support an inference that Floyd had both the intent and capability to maintain dominion and control over the items found in the mobile home. First, many of the State's witnesses testified at trial that the mobile home was being used as a methamphetamine lab and, thus, the State presented evidence of a drug manufacturing setting. Moreover, when the police officers executed the search warrant, Davis lied about Floyd's presence in the mobile home, and Floyd was hiding underneath the bed. That Floyd was attempting to avoid police supports an inference that he was aware of the items contained in the mobile home, in addition to the illegal nature of those items.

Moreover, the officers found many of the items commonly used in manufacturing methamphetamine scattered around the kitchen and living room in plain view. Those items included starter fluid, a pitcher of ether, approximately 500 cold pills that tested positive for pseudoephedrine, coffee filters, and a coffee grinder containing white residue. In addition, Nelson testified that in early March 2002, he had asked Floyd to stay at the mobile home while Nelson recuperated from surgery. Although there was no testimony regarding how often Floyd had stayed there, Floyd had personal items, including the flannel shirt Chief Deputy Goodwin had seen him wearing, and a pair of jeans inside the home within close proximity to contraband. Further, the officers found what was identified as a recipe for making methamphetamine inside Floyd's wallet, which police recovered from the living room in close proximity to items used to manufacture methamphetamine. The officers also found a snort tube that contained residue which tested positive for methamphetamine in the living room of the mobile home. Finally, once the officers placed Floyd under arrest, he made incriminating statements that Davis was not involved and that the "stuff" was not hers.

Based on the evidence that Floyd: (1) was asked to stay at the mobile home prior to his arrest, (2) hid underneath the bed to avoid police, (3) made incriminating statements to police, (4) had items of personal property within close proximity to contraband, (5) items of contraband were in plain view, (6) officers recovered a recipe for making methamphetamine from Floyd's wallet; and (7) there was evidence of a drug manufacturing setting, we conclude that the evidence supports the inference that Floyd had constructive possession of the items used to manufacture methamphetamine, the chemical reagents and precursors, and the small amount of methamphetamine contained in the snort pipe. *See Person,* 661 N.E.2d at 590 (discussing factors which support inference of constructive possession). Accordingly, the State presented sufficient evidence to support his convictions for dealing in methamphetamine, possession of precursors, and possession of methamphetamine.

**Issue Two: Lesser Included Offense**

Floyd next asserts that the trial court erred when it entered judgment and conviction and sentenced him on both the dealing in methamphetamine and possession of precursors convictions. In particular, he maintains that possession of precursors is a lesser included offense of dealing in methamphetamine. Again, we must disagree.

Indiana Code Section 35–38–1–6 provides that if a defendant is charged with an offense and an included offense in separate counts and is found guilty of both

counts, "judgment and sentence may not be entered against the defendant for the included offense." And Indiana Code Section 35–41–1–16 states:

"Included offense" means an offense that:

(1) is established by proof of the same material elements or less than all the material elements required to establish the commission of the offense charged;

(2) consists of an attempt to commit the offense charged or an offense otherwise included therein; or

(3) differs from the offense charged only in the respect that a less serious harm or risk of harm to the same person, property, or public interest, or a lesser kind of culpability, is required to establish its commission.

A lesser included offense is necessarily included within the greater offense if it is impossible to commit the greater offense without first having committed the lesser. *Zachary v. State*, 469 N.E.2d 744, 749 (Ind.1984). "[W]hether an offense is included in another within the meaning of Section 35–38–1–6 requires careful examination of the facts and circumstances of each particular case." *Iddings v. State*, 772 N.E.2d 1006, 1017 (Ind.Ct.App.2002), *trans. denied.*

■ Both parties direct us to this court's opinions in *Iddings* and *Bush*, cases decided on the same day and both of which involve whether, under the facts presented therein, a defendant's conviction for possession of chemical reagents or precursors is a lesser included offense of dealing in methamphetamine. Those cases recognize that when a defendant is charged with both dealing in methamphetamine by manufacturing it and possession of chemical reagents or precursors, the latter may be a lesser included offense of the former, depending on the facts presented therein, a defendant's conviction

sented. As we explained in *Iddings*, 772 N.E.2d at 1016–17:

We accept that it is impossible to knowingly or intentionally manufacture methamphetamine without first possessing the chemical precursors of methamphetamine with the intent to make the drug. Methamphetamine cannot be conjured up out of thin air. *The sole practical difference between these two offenses is that one may be guilty of possessing chemical precursors with intent to manufacture without actually beginning the manufacturing process, whereas the manufacturing process must, at the very least, have been started by a defendant in order to be found guilty of manufacturing methamphetamine.*

(Emphasis added).

The facts of *Iddings* and *Bush* are similar, namely, both involve police officers who discovered indisputable evidence of methamphetamine labs in defendants' homes. But in *Bush*, 772 N.E.2d at 1024–25, the police did not recover any completed methamphetamine from the defendant's home. Rather, the evidence showed that, at the time the officers executed the search warrant, the defendant was in the process of manufacturing methamphetamine. *Id.* at 1022. In *Iddings*, however, there was evidence that the defendant: "(1) had already manufactured methamphetamine and (2) possessed the chemical precursors of methamphetamine with the intent to manufacture *more* of the drug." 772 N.E.2d at 1017 (emphasis in original).

In *Bush*, we reversed the defendant's conviction for possession of chemical reagents and precursors because "[i]t [was] impossible to fairly state that the manufacturing and possession of precursors offenses ... were clearly independent of each other...." 772 N.E.2d at 1024. By

contrast, in *Iddings*, 772 N.E.2d at 1017, we stated:

> Under these particular circumstances, we cannot say Iddings' possession of chemical precursors of methamphetamine was necessarily a lesser included offense of manufacturing methamphetamine because the evidence permits the reasonable conclusion that two independent offenses were committed for which Iddings could be separately punished.

■ Here, like in *Iddings*, the officers recovered evidence of completed methamphetamine from the mobile home, namely, the residue found in the snort pipe that tested positive for methamphetamine. Further, the officers found chemical precursors, along with many other items used in the methamphetamine manufacturing process, which supports the inference that Floyd intended to manufacture more methamphetamine. Accordingly, the evidence in this case permits the reasonable conclusion that Floyd committed two independent offenses for which he may be separately punished. *See id.*

Still, Floyd asserts that our analysis should not end just because we have determined that, like the defendant in *Iddings*, he possessed completed methamphetamine. Instead, he contends that "the fact that completed methamphetamine might be found along with the reagents and precursors doesn't preclude the possibility that a defendant is also in the process of actually using the reagents and precursors in his possession to make methamphetamine at the time." Brief of Appellant at 30. We agree that Floyd could have been in the process of manufacturing methamphetamine with the chemical reagents and precursors in his possession. His argument highlights the fine distinction between possessing chemical reagents and precursors *with the intent to manufacture* methamphetamine and dealing in metham-

phetamine *by having begun* the manufacturing process. *See Bush*, 772 N.E.2d at 1022–23 (holding that given statutory definition of "manufacture," defendant does not have to possess finished product or even complete manufacturing process to be convicted of dealing in methamphetamine). Nevertheless, his argument is merely a supposition.

Again, our role on appeal is to carefully examine the facts and circumstances of each particular case to determine whether an offense is included in another. *See Iddings*, 772 N.E.2d at 1017. The significant inquiry here, as it was both in *Iddings* and *Bush*, is whether "it is impossible to commit the greater offense without first having committed the lesser." *Iddings*, 772 N.E.2d at 1016. As we have determined, the State's evidence shows that it was not impossible for Floyd to have committed the two independent offenses. Rather, the evidence permits the reasonable conclusion that Floyd committed both dealing in methamphetamine and possession of precursors. Thus, this case is analogous to the facts in *Iddings* and distinguishable from the facts in *Bush*. We conclude on these facts that Floyd's possession of reagents is not a lesser included offense of dealing in methamphetamine.

Affirmed.

BROOK, C.J., and BAILEY, J., concur.