## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 23 2015, 8:59 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Steven E. Ripstra
Jasper, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

James Jay Green III,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

September 23, 2015

Court of Appeals Case No.
82A01-1411-CR-474

Appeal from the Vanderburgh
Circuit Court
The Honorable David D. Kiely,
Judge
The Honorable Kelli E. Fink,
Magistrate
Cause No. 82C01-1403-FA-275

**Bailey, Judge.**

# Case Summary

James Jay Green, III ("Green") appeals his convictions and sentences for Dealing in Methamphetamine, as a Class A felony,[1] and Possession of Methamphetamine, as a Class B felony.[2] We affirm.

# Issues

Green presents four issues for our review, which we restate as the following five:

I. Whether the trial court abused its discretion in admitting evidence seized after a warrantless search of Green's apartment;

II. Whether there was sufficient evidence to support his conviction for Dealing in Methamphetamine;

III. Whether his convictions for Dealing in Methamphetamine and Possession of Methamphetamine violate principles of double jeopardy under the actual evidence test;

IV. Whether the trial court abused its discretion in failing to find two mitigating factors advanced by Green; and

V. Whether his sentence was inappropriate.

# Facts and Procedural History

---

[1] Ind. Code §§ 35-48-4-1.1(a)(1)(A) & 35-48-4-1.1(b)(3). Due to substantial revisions to the Indiana Code effective July 1, 2014, this offense is now a Level 4 felony. Throughout this opinion, we refer to the versions of the statutes in effect at the time of Green's offense.

[2] I.C. §§ 35-48-4-6.1(a) & 35-48-4-6.1(b)(2).

[3] In the late evening of March 7, 2014, Evansville Police Department ("EPD") officers responded to an anonymous tip received by the EPD and Vanderburgh County Sheriff's Office Joint Task Force that methamphetamine was being manufactured in apartment K4 of the Shady Tree Apartments in Evansville. When EPD Officer Nathan Hassler ("Officer Hassler") knocked on the door of apartment K4, Green, the lessee, answered and then stepped outside to talk to the officer.

[4] EPD Officer John Montgomery ("Officer Montgomery") then approached the front door where Officer Hassler and Green were standing. As he approached, he smelled "a slight chemical odor" (Tr. 52) of a solvent that he "believed to be Coleman fuel" coming from the apartment. (Tr. 56.) Based on his training and experience, Officer Montgomery associated the odor with the manufacture of methamphetamine. He then informed Officer Hassler that he smelled a "chemical smell." (Tr. 148.)

[5] Officer Hassler asked Green if anyone else was inside the apartment, and Green stated that his girlfriend, Cherron Roberts ("Roberts"), was in the bedroom. From his experience and training, Officer Hassler knew meth labs "are very dangerous and they can explode[.]" (Tr. 42.) Because "the chemical smell, it's a safety hazard" (Tr. 151), Officer Hassler entered the apartment without a warrant or Green's consent. Officer Hassler executed the search for the limited purpose of retrieving Roberts from the apartment.

[6] Upon entering the apartment, Officer Hassler observed in plain view on a coffee table a tied corner baggie containing a white powdery substance, which he suspected was methamphetamine. He passed through the living room and discovered Roberts in the back bedroom. Items consistent with the manufacture of methamphetamine, including aluminum foil, lye, a box of cold packs (instant cold compresses), and plastic tubing, were also in plain view on the bedroom floor. Officer Hassler permitted Roberts to put on some clothing and secure her dog in the bathroom before escorting her out of the apartment. He then contacted the Joint Task Force's Methamphetamine Suppression Unit.

[7] Based on information he received from Officer Hassler, Vanderburgh County Sheriff's Office Detective J.J. Budde ("Detective Budde") secured a warrant to search the apartment. When executing the warrant, officers found precursors to and items commonly associated with the manufacture of methamphetamine, including: ninety-six pills (5.6 grams) of pseudoephedrine-based cold medicine in blister packs removed from the boxes, salt, Coleman fuel, Drain Out drain cleaner containing lye (sodium hydroxide), cold compresses containing ammonia nitrate, a lithium battery, Liquid Fire (sulfuric acid), clean plastic bottles with the labels removed, a funnel, aluminum foil, cutting tools, tubing run through a bottle cap, coffee filters, and a digital scale. The apartment's hard-wired smoke detector had been disconnected and removed.

[8] A coffee filter containing a white powdery substance was found in Roberts's purse in the living room. Police found in the bedroom closet a dinner plate containing a white powdery substance, which the officer collected from the

plate and placed in a plastic bag. Subsequent testing by the Indiana State Police laboratory revealed that both the coffee filter and the plate powder tested positive for methamphetamine. A syringe was found in the bedroom closet. A smoking pipe with burnt residue was found on a chest by the bed. Two additional syringes and a spoon were found in a chest drawer next to prescriptions labeled with Green's name.

[9] Officers also found in Roberts's purse receipts from Wal-Mart, Rural King, and Dollar General from February 23, March 4, and March 7, 2014 for purchases of Coleman fuel, salt, a 1.5 liter bottled soda, cold compresses, a lithium battery, and coffee filters. A March 7, 2014 Rural King receipt for the purchase of Drain Out was found in Green's pocket. Green was placed under arrest. Detective Budde later obtained surveillance video from the Wal-Mart, Dollar General, and Rural King stores, which showed Green and Roberts, either together or individually, purchasing items from those stores on February 23, March 4, and March 7, 2014.

[10] On March 11, 2014, Green was charged with Dealing in Methamphetamine, as a Class A felony[3] ("Count 1"), and Possession of Methamphetamine, as a Class B felony ("Count 2"). Also on March 11, 2014, the State alleged that Green

---

[3] The code section captioned "Dealing in methamphetamine" also prohibits methamphetamine manufacture. Originally, the State charged that Green "did possess with the intent to manufacture methamphetamine" in violation of Indiana Code section 35-48-4-1.1(a)(2). (App. 9.)

was a Habitual Substance Offender.[4] On June 20, 2014, the State amended Count 1, alleging that Green "did knowingly or intentionally manufacture methamphetamine[.]"[5] (App. 12.)

[11] On April 23, 2014, Green filed a motion to suppress all evidence seized from his apartment, arguing that the evidence was obtained through an illegal search and seizure in violation of the Fourth Amendment to the U.S. Constitution and Article 1, Section 11 of the Indiana Constitution. A suppression hearing was held on May 29, 2014, after which the motion was denied on June 10, 2014.

[12] A jury trial was held on June 23 and 24, 2014, at the conclusion of which Green was found guilty of both counts. Under Count 1, the jury also found Green guilty of Attempted Dealing in Methamphetamine. The trial court found that Attempted Dealing in Methamphetamine was a lesser-included offense of Dealing in Methamphetamine, and entered judgments of conviction only on Dealing in Methamphetamine and Possession of Methamphetamine. Green then admitted to having two prior unrelated substance abuse convictions, and the court adjudicated him a habitual substance offender.

---

[4] I.C. § 35-50-2-10.

[5] We note that the amended charging information for Count 2 cites Indiana Code section 35-48-4-1.1(a)(1)(B), which prohibits financing the manufacture of methamphetamine. However, the allegation contained in the information relates to subsection (a)(1)(A) because it alleges that Green "did knowingly or intentionally manufacture methamphetamine." (App. 12.) It is well settled that the allegation in the body of the information, not the cited statute, defines the crime. *Hestand v. State*, 491 N.E.2d 976, 980 (Ind. 1986). The jury was instructed on knowingly or intentionally manufacturing.

On October 9, 2014, a sentencing hearing was held. Green was sentenced to thirty-five years in the Indiana Department of Correction ("DOC") on Count 1 to be served concurrently with a two-year sentence in the DOC on Count 2. The court subsequently corrected Green's sentence on Count 2 to reflect his conviction for a Class B felony, and sentenced him to twelve years in the DOC, to run concurrently with his sentence in Count 1. The court also enhanced Green's sentence on Count 1 by three years due to his status as a habitual substance offender, yielding an aggregate sentence of thirty-eight years.

Green now appeals his convictions and sentences.

# Discussion and Decision

## Admission of Evidence

Green first argues that Officer Hassler's warrantless entry into his apartment violated his rights under the Fourth Amendment to the U.S. Constitution and Article 1, Section 11 of the Indiana Constitution. Because a warrant was subsequently obtained based on items Officer Hassler observed in plain view when he was inside the apartment, Green argues that all evidence seized from his apartment must be suppressed as "fruit of the poisonous tree."[6]

---

[6] Although the warrant is not included in the appendix, Green contends and the State concedes that the warrant was obtained based on Officer Hassler's observations made inside the apartment during the warrantless search.

[16] Where a pretrial motion to suppress is denied, the case proceeds to trial, and the defendant renews his objection to the admission of the evidence, the issue is best framed as challenging the admission of evidence at trial. *Clark v. State*, 994 N.E.2d 252, 259 (Ind. 2013). The trial court has broad discretion to rule on the admissibility of evidence at trial. *Guilmette v. State*, 14 N.E.3d 38, 40 (Ind. 2014). We review the court's ruling for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances before the court and the error affects a party's substantial rights. *Id.* (citation and quotation marks omitted). An appellant's challenge to the constitutionality of a search or seizure raises a question of law, which we review *de novo*. *Id.* at 40-41.

## Fourth Amendment

[17] The Fourth Amendment provides, in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." The Fourth Amendment's protections against unreasonable searches and seizures extend to the States through the Fourteenth Amendment. *Taylor v. State*, 842 N.E.2d 327, 330 (Ind. 2006) (citing *Mapp v. Ohio*, 367 U.S. 643, 650 (1961); *Berry v. State*, 704 N.E.2d 462, 464-65 (Ind. 1998)).

[18] "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *State v. Straub*, 749 N.E.2d 593, 597 (Ind. Ct. App. 2001) (quoting *United States v. U.S. Dist. Court*,

407 U.S. 297, 313 (1972)). A principal protection against unnecessary intrusions into private dwellings is the Fourth Amendment's warrant requirement. *Id.* Searches performed by government officials without obtaining warrants are *per se* unreasonable under the Fourth Amendment, subject to a "few specifically established and well-delineated exceptions." *Holder v. State*, 847 N.E.2d 930, 935 (Ind. 2006) (quoting *Katz v. U.S.*, 389 U.S. 347, 357 (1967)). The State bears the burden of proving that an exception to the warrant requirement applied at the time of a warrantless search. *Id.* The remedy for an illegal warrantless search is the suppression of the evidence obtained from the search. *Cudworth v. State*, 818 N.E.2d 133, 137 (Ind. Ct. App. 2004), *trans. denied.*

[19] One exception allows police officers to dispense with the warrant requirement where exigent circumstances exist. *Holder*, 847 N.E.2d at 936. As our supreme court has explained:

> The warrant requirement becomes inapplicable where the "'exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393–94, 98 S. Ct. 2408, 2414, 57 L. Ed. 2d 290, 301 (1978). Among the exigencies that may properly excuse the warrant requirement are threats to the lives and safety of officers and others and the imminent destruction of evidence. *See Minnesota v. Olson*, 495 U.S. 91, 100, 110 S. Ct. 1684, 1690, 109 L. Ed. 2d 85, 95 (1990). Law enforcement may be excused from the warrant requirement because of exigent circumstances based on concern for safety as long as the State can prove that a delay to wait for a warrant would gravely endanger the lives of police officers and others. *Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S. Ct. 1642, 1646,

18 L. Ed. 2d 782, 787 (1967); *see also Geimer v. State*, 591 N.E.2d 1016, 1019 (Ind. 1992).

*Id.* at 936-37. A police officer's subjective belief that exigent circumstances exist is insufficient to justify a warrantless entry into a home or apartment; rather, the test is objective and the State must establish that the circumstances as they appear at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside is in need of immediate aid. *Cudworth*, 818 N.E.2d at 137 (citing *United States v. Richardson*, 208 F.3d 626, 629 (7th Cir. 2000)).

[20] The State contends that because the manufacture of methamphetamine is a volatile chemical process, Officer Montgomery's detection of a chemical smell associated with methamphetamine manufacture constituted exigent circumstances that justified a "brief and limited warrantless search to find and remove Roberts from the apartment for her safety." (Appellee's Br. 14.) Green argues, however, that a slight chemical odor was not sufficient to establish exigent circumstances and that the chemical smell "was clearly a pretext" for a warrantless entry into his apartment. (Appellant's Br. 17.) He points to this Court's decision in *State v. Crabb*, in which this Court expressed hesitancy to "draw a bright line which would allow officers to enter a home without a warrant based solely on the smell of ether[,]" a substance commonly used in the manufacture of methamphetamine. 835 N.E.2d 1068, 1071 (Ind. Ct. App. 2005), *trans. denied*.

In this case, police officers were responding to an anonymous tip that methamphetamine was being manufactured in apartment K4. After Green opened the door, Officer Montgomery, who had training and experience with detecting clandestine methamphetamine labs, testified that he detected "a slight chemical odor" that he had smelled at "some previous meth labs I've dealt with." (Tr. 52.) Specifically, he smelled "[s]olvents" (Tr. 54), which he "believed to be Coleman fuel." (Tr. 56.) Officer Montgomery was aware that Coleman fuel is commonly used in the "one-pot" method of methamphetamine manufacture. For his part, Officer Hassler was aware that methamphetamine labs "are very dangerous and they can explode[.]" (Tr. 42.) He believed "the chemical smell, it's a safety hazard." (Tr. 151.) After Green confirmed that another person was in the apartment, Officer Hassler decided to enter the apartment.[7] Officer Hassler explained:

> Let's just say that [. . .] there was a meth lab in there, let's just
> completely say that. If that is, in fact, true, those things are very
> dangerous and they can explode, and I don't want somebody like
> shaking one up and then tossing it out the door, and then here I am
> gettin' blown up by a meth lab . . . .

---

[7] At the suppression hearing, Officer Hassler called his entry into the apartment a "protective sweep." (Tr. 27.) As explained by this Court: "In *Maryland v. Buie*, 494 U.S. 325, 334 (1990), the Supreme Court held that *incident to an arrest*, police officers may, as a precautionary matter and without probable cause or reasonable suspicion, conduct a brief search of areas immediately adjoining the place of arrest from which an attack could be immediately launched." *Cudworth*, 818 N.E.2d at 138. Green was not under arrest at the time Officer Hassler entered the apartment. The State does not argue, and denies that it ever argued, that Officer Hassler's entry was a protective sweep incident to an arrest.

(Tr. 42-43.) He also expressed concern for the occupant's safety, stating that while inside the building he was "just concerned with getting her out of the apartment." (Tr. 28.)

[22] Although the Court in *Crabb* expressed a hesitancy to find exigent circumstances solely based on the smell of ether, the Court ultimately held that the smell of ether, evidence that the apartment was occupied, and a report that a child was present "caused Troopers to reasonably believe that a person inside the apartment was in immediate need of aid." 835 N.E.2d at 1071. Here, too, Officer Hassler's concern for the safety of officers and a person known to be in an apartment in which police suspected methamphetamine was being manufactured was sufficient to justify the warrantless entry into Green's apartment under the exigent circumstances exception. *See also Holder*, 847 N.E.2d at 939 (holding that warrantless entry into a home was justified by exigent circumstances where extremely strong odor of ether was detected coming from the home, officers suspected methamphetamine manufacture based on defendant's omissions, officer knew of dangers of manufacturing process, and home was occupied by persons including a child); *VanWinkle v. State*, 764 N.E.2d 258, 266 (Ind. Ct. App. 2002) (upholding the warrantless entry into a defendant's home after callers reported a strong ether odor emanating from the house, police smelled the odor and observed evidence of methamphetamine manufacture from outside, police knew the dangers of the manufacturing process, and two people were in the house), *trans. denied*. As this Court stated in *VanWinkle*, "[t]he combined knowledge of the fact that the

manufacture of methamphetamine can be very dangerous and the fact that there were still other people in the residence would cause any reasonable police officer to see the immediate need to remove any remaining persons from the residence." 764 N.E.2d at 266. The State carried its burden to establish that the exigent circumstances exception to the warrant requirement applied at the time Officer Hassler entered Green's apartment.

## Article 1, Section 11

[23] Green also argues that the warrantless search of his apartment violated Article 1, Section 11 of the Indiana Constitution.[8]

[24] The language of Section 11 mirrors the Fourth Amendment's protections against unreasonable searches and seizures. U.S. Const. amend. IV; Ind. Const. art 1, § 11; *Trowbridge v. State*, 717 N.E.2d 138, 143 (Ind. 1999). However, the test for determining a rights violation differs between the two provisions. *Trowbridge*, 717 N.E.2d at 143. Analysis under Article 1, Section 11 turns on the specific facts of each case and whether police conduct is reasonable in light of the totality of the circumstances. *VanWinkle*, 764 N.E.2d at 266. "[T]he totality of the circumstances requires consideration of both the degree of intrusion into the subject's ordinary activities and the basis upon

---

[8] The State contends that although Green cited the Indiana Constitution and its test, Green failed to present an independent analysis under the state standard and therefore the issue is waived. Although Green's discussion of the Indiana standard is minimal, Green cited to relevant case law on exigent circumstances that interprets both the federal and state standards. (*See* Appellant's Br. 11-13 (citing *VanWinkle*, 764 N.E.2d 258)). As the discussion is no more or less developed than his Fourth Amendment argument, we address the issue.

which the officer selected the subject of the search or seizure." *Litchfield v. State*, 824 N.E.2d 356, 360 (Ind. 2005). "Our determination of the reasonableness of a search or seizure under Section 11 often 'turn[s] on a balance of: 1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs.'" *Holder*, 847 N.E.2d at 940 (quoting *Litchfield*, 824 N.E.2d at 361).

[25] In this case, the officers suspected methamphetamine manufacture based on an anonymous tip. When Green opened the door, an officer detected a chemical smell, which based on his training and experience the officer associated with methamphetamine labs. Both officers were aware that methamphetamine labs use flammable chemicals and involve a volatile process that presents risk of explosions. After Green informed the officer that Roberts was inside the apartment, Officer Hassler entered and removed Roberts from the premises.

[26] Although the degree of intrusion was high, law enforcement's need to ensure safety in light of the known dangers associated with clandestine methamphetamine labs outweighs the intrusion. We therefore conclude that, based on the totality of the circumstances, Officer Hassler's entry into the apartment was reasonable under Article 1, Section 11. *See VanWinkle*, 764 N.E.2d at 267 (finding that the warrantless entry into a residence was reasonable under Article 1, Section 11 "because, had the officers taken the time to get a search warrant at that point, the people remaining in the residence could have been injured by the volatile manufacturing process, could have

destroyed evidence, and/or could have attempted to inflict harm upon the officers or others.").

[27] The limited warrantless entry of Green's apartment was justifiable under the exigent circumstances exception to the warrant requirement and was reasonable under Article 1, Section 11. The trial court did not abuse its discretion in admitting the evidence seized after police obtained a warrant based on items observed in plain view during the officer's warrantless entry.

# Sufficiency

[28] Green next argues there was insufficient evidence to support his conviction for Dealing in Methamphetamine.[9]

[29] Our standard of review for sufficiency of the evidence claims is well settled. We consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not assess the credibility of witnesses or reweigh evidence. *Id.* We will affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.* (quoting *Jenkins v. State*, 726 N.E.2d 268, 270 (Ind. 2000)). "The evidence is sufficient if an inference may

---

[9] Although Green's statement of the issue purportedly challenges the sufficiency of the evidence to support both convictions, he presents argument only as to Dealing in Methamphetamine. Thus, we do not review the sufficiency of the evidence to support his Possession of Methamphetamine conviction.

reasonably be drawn from it to support the verdict." *Id.* at 147 (quoting *Pickens v. State*, 751 N.E.2d 331, 334 (Ind. Ct. App. 2001)).

[30] A person who knowingly or intentionally manufactures methamphetamine, pure or adulterated, commits dealing in methamphetamine, a Class B felony. I.C. §§ 35-48-4-1.1(a)(1)(A). The offense is a Class A felony if the person manufactured the drug in, on, or within one thousand feet of a family housing complex. I.C. § 35-48-4-1.1(b)(3).[10] "Manufacture" includes the "production, preparation . . . or processing of a controlled substance . . . ." I.C. § 35-48-1-18.

[31] The State charged that on or about March 7, 2014, Green "did knowingly or intentionally manufacture methamphetamine, pure or adulterated, within one thousand (1000) feet [of a] family housing complex[.]" (App. 12.)

[32] At trial, EPD Detective Brock Hensley ("Detective Hensley") described in detail the "one pot" methamphetamine manufacturing process.[11] The State then introduced evidence that all of the precursors and items necessary to the "one pot" method were found throughout Green's apartment. Videotape introduced at trial showed Green and Roberts purchasing many of these items in the days leading to Green's arrest. In addition to the precursors, the plastic

---

[10] A "family housing complex" means a building or series of buildings that is operated as an apartment complex. I.C. § 35-31.5-2-127(3). Green does not challenge the State's evidence that Shady Tree Apartments was an apartment complex and thus within one thousand feet of a family housing complex.

[11] In summarizing the precursors and items necessary to manufacture methamphetamine, he listed: pseudoephedrine, Coleman fuel (an organic solvent), lye, ammonia nitrate, lithium batteries (or some water-reacting metal), sulfuric acid (usually Liquid Fire), salt, tubing and a bottle, and a reaction vessel.

bottle labels had been removed,[12] tubing was inserted through a bottle cap,[13] the apartment's smoke detector had been disabled,[14] and the pseudoephedrine pills were removed from the box. Upon arrival at the apartment, Officer Montgomery smelled a chemical odor he associated with methamphetamine manufacture. Further, a coffee filter containing methamphetamine was found in Roberts's purse on or near the coffee table in Green's living room. Detective Hensley testified that coffee filters are commonly used to dry out methamphetamine after production and before consumption. He further testified "I've never seen [a person] sell a coffee filter with meth to someone else." (Tr. 122.)

[33] Green cites numerous appellate cases reviewing the sufficiency of evidence presented to support Dealing in Methamphetamine convictions, arguing that in every case more evidence was present than here. He notes that the precursors found throughout Green's apartment "were not mixed, altered or crushed." (Appellant's Br. 19.) Green argues that "the only item the State contended was proof of a manufacturing process was the piece of tubing running through a

---

[12] Detective Budde testified that in his experience, labels are usually torn off so that the manufacturer can view the reaction going on inside.

[13] Detective Hensley testified that tubing pushed through a bottle cap and a plastic bottle are used to "smoke off" methamphetamine oil and convert it into a useable form of methamphetamine.

[14] EPD Detective Patrick McDonald ("Detective McDonald") testified that hard-wired smoke detectors are often removed during the manufacture of methamphetamine because the chemical reaction can produce smoke and often releases other matter into the air that can trigger an alarm.

bottle cap." (Appellant's Br. 20.) In essence, he argues that there was insufficient evidence of manufacturing to support his conviction.[15]

[34] "Indiana courts have consistently held that the manufacturing process need not be complete to violate the manufacturing statute." *Buelna v. State*, 20 N.E.3d 137, 141 (Ind. 2014). Sufficient evidence of manufacturing has been found where the evidence shows that steps taken to manufacture were in progress at the scene. *See, e.g., Bush v. State*, 772 N.E.2d 1020, 1023 (finding sufficient evidence that defendant knowingly manufactured methamphetamine where police found at the defendant's residence several items used in methamphetamine manufacture and the State introduced testimony that the lab was "in process"). *See also Floyd v. State*, 791 N.E.2d 206, 210 (Ind. Ct. App. 2003) (where all precursors, chemical reagents, equipment to manufacture methamphetamine, and a small amount of finished methamphetamine were found in a mobile home belonging to "Nelson," there was sufficient evidence of manufacturing such that the only dispositive issue was whether the defendant had constructive possession of the evidence), *trans. denied*.

[35] Here, there was no testimony that the lab was currently in process. However, Green had collected *all* of the precursors and items necessary to manufacture

---

[15] In its brief, the State argues there was sufficient evidence to support the jury's guilty verdict for Attempted Dealing in Methamphetamine, but does not address Green's conviction for Dealing in Methamphetamine. Although the jury found Green guilty of both Attempted Dealing and Dealing in Methamphetamine, the trial court found that Attempted Dealing was a lesser-included offense of Dealing in Methamphetamine and entered judgment of conviction on Dealing in Methamphetamine. We review the sufficiency of the evidence to support the offense of which Green was convicted.

methamphetamine using the "one pot" method. He had also begun the process by removing the reaction vessel labels, pushing tubing through a bottle cap, and removing the pseudoephedrine pills from the box. There was an active smell of solvent in the apartment. And a coffee filter with methamphetamine indicative of home manufacturing, rather than purchase, was found in a common area. This was sufficient evidence from which a reasonable fact-finder could infer that methamphetamine was being manufactured.

[36] Green argues, however, that even if this was sufficient evidence of manufacturing, there was "a reasonable explanation: All the items were [Roberts's]." (Appellant's Br. 27.) To the extent that Green asks us to reweigh the evidence by pointing to testimony implicating Roberts, we decline Green's invitation. However, to the extent Green implies that there was insufficient evidence that he possessed the items used in the manufacturing process, we disagree. Possession of contraband can be either actual or constructive.

> Constructive possession is established by showing that the defendant has both the intent and capability to maintain dominion and control over the contraband. *Person v. State,* 661 N.E.2d 587, 590 (Ind. Ct. App. 1996), *trans. denied.* In cases where the accused has exclusive possession of the premises on which the contraband is found, an inference is permitted that he or she knew of the presence of contraband and was capable of controlling it. *Id.* However, when possession of the premises is non-exclusive, the inference is not permitted absent some additional circumstances indicating knowledge of the presence of the contraband and the ability to control it. *Id.* Among the recognized "additional circumstances" are: (1) incriminating statements by the defendant; (2) attempted flight or furtive gestures; (3) a drug manufacturing setting; (4) proximity of the defendant to the contraband; (5) contraband is in plain view; and (6)

> location of the contraband is in close proximity to items owned by the defendant. *Id.*

*Floyd*, 791 N.E.2d at 210-11.

[37] Here, the precursors and manufacturing tools were found dispersed throughout Green's apartment in close proximity to his personal items. Many of the items were found in plain view. Although the coffee filter was found in Roberts's purse, the purse was in the apartment living room while Roberts was in the bedroom. Roberts was Green's girlfriend at the time. Videotape introduced into evidence showed Green purchasing, both with Roberts and independently, some of the precursors and manufacturing items. All of this evidence supports the inference that Green had intent and capability to maintain dominion and control over the items necessary to manufacture methamphetamine.

[38] There was sufficient evidence to support Green's conviction for Dealing in Methamphetamine.

# Double Jeopardy

[39] Article 1, Section 14 of the Indiana Constitution provides: "No person shall be put in jeopardy twice for the same offense." Indiana's Double Jeopardy Clause prevents the State from being able to proceed against a person twice for the same criminal transgression. *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999). Under Article 1, Section 14, two or more offenses are the same offense "if, with respect to *either* the statutory elements of the challenged crimes *or* the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Id.* Whether

multiple convictions violate the prohibition against double jeopardy is a question of law that the Court reviews *de novo*. *Weddle v. State*, 997 N.E.2d 45, 47 (Ind. Ct. App. 2013), *trans. denied*.

[40] Under the actual evidence test, the evidence presented at trial is examined to determine whether each challenged offense was established by separate and distinct facts. *Richardson*, 717 N.E.2d at 53. "To show that two challenged offenses constitute the 'same offense' in a claim of double jeopardy, a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense." *Id.* If the evidentiary facts establishing one offense establish only one or several, but not all, of the essential elements of the second offense, there is no double jeopardy violation. *Micheau v. State*, 893 N.E.2d 1053, 1065 (citing *Spivey v. State*, 761 N.E.2d 831, 833 (Ind.2002)), *trans. denied*. When applying the actual evidence test, we identify the essential elements of each challenged crime and evaluate the evidence from the jury's perspective, considering where relevant the jury instructions, argument of counsel, and other factors that may have guided the jury's determination. *Lamagna v. State*, 776 N.E.2d 955, 959 (Ind. Ct. App. 2002).

[41] In Count 1, Green was charged with violating Indiana Code section 35-48-4-1.1(a)(1)(A), which provides: "A person who . . . knowingly or intentionally . . . manufactures . . . methamphetamine, pure or adulterated . . . commits dealing in methamphetamine, a Class B felony[.]" The offense is a Class A felony if the

person manufactured the drug in, on, or within one thousand feet of a family housing complex. I.C. § 35-48-4-1.1(b)(3). In Count 2, Green was charged with violating Indiana Code section 35-48-4-6.1(a), which provides: "A person who, without a valid prescription or order of a practitioner acting in the course of the practitioner's professional practice, knowingly or intentionally possesses methamphetamine (pure or adulterated) commits possession of methamphetamine, a Class D felony[.]" The offense is a Class B felony if the person in possession of methamphetamine possesses less than three grams of pure or adulterated methamphetamine in, on, or within one thousand feet of a family housing complex. I.C. § 35-48-4-6.1(b)(2).

[42] In this case, the State presented evidence that 0.61 grams of methamphetamine was found on a plate in Green's bedroom closet. Various paraphernalia associated with methamphetamine use, including syringes, a spoon, and a smoking pipe, were found in the apartment. Two syringes and a spoon were found in a bedroom chest drawer next to prescriptions labeled with Green's name. In its closing arguments, the State did not discuss at any length the Possession of Methamphetamine charge, arguing to the jury simply that the methamphetamine "wasn't in his pocket, but it was in his home." (Tr. 631-32.)[16]

---

[16] The State at one point argued that finished product was "on his livingroom [sic] table." (Tr. 594.) However, the tied corner baggie on the coffee table that Officer Hassler suspected was methamphetamine was never tested. The only items tested were the coffee filter and the powder on the plate.

[43] The State also presented evidence that Green had collected all of the precursors necessary to manufacture methamphetamine, constructed tools needed in the manufacturing process, and possessed a coffee filter with methamphetamine indicative of the manufacturing process. The State focused its closing arguments on the Dealing in Methamphetamine charge, summarizing the evidence as thus:

> In fact, Detective Budde told you that they had salt, lithium batteries, Coleman camping fuel, Liquid Fire, pseudoephedrine, cold packs, a funnel, aluminum foil, coffee filters, reaction vessels, HCL generators, tubing, tubing through the cap of the 20 ounce or 2 liter bottle, and lye which you saw the defendant purchase. You heard from Officer Montgomery who said he smelled a chemical reaction, chemical odor, that he associated with the manufacture of methamphetamine. You heard from the chemist from the Indiana State Police lab, extensively, that the product that was . . . the item found in the apartment was, in fact, methamphetamine. [. . . .] There were supplies everywhere. Some of them common household items, I agree, but they had them all, and they had finished product, methamphetamine, on the coffee filters which were located in the co-defendant's purse. Remember the testimony from Detective McDonald that you dry the methamphetamine out to have your finished product on the coffee filters, that's what they're used for. Remember Detective Budde telling you that they often time strip the packaging or the labeling off the 2 liter bottles so that they can see inside, they can see the reaction. [. . . .] Ladies and gentleman, they had gathered all of the evidence needed to manufacture methamphetamine and by removing the smoke detector, by inserting the tubing through the cap, by shredding the pseudoephedrine box, taking the pills out of it . . . [t]hey had begun the process of manufacturing methamphetamine . . . .

(Tr. 591-93.)

[44] Green contends that the "common, essential element of both crimes [is] a knowing or intentional possession of methamphetamine" and that "Possession

is a lesser-included offense of Manufacturing/Dealing, based upon [these] facts." (Appellant's Br. 31.) He seems to argue that the finished methamphetamine was used to support both convictions in violation of the actual evidence test.

[45] The State acknowledges that during closing arguments, the prosecutor argued that the presence of finished methamphetamine product in the apartment was "not only evidence of possession" but "also evidence of the manufacturing." (Tr. 594.)[17] However, the thrust of the State's closing argument as to the Dealing in Methamphetamine charge was that Green had assembled all of the precursors and tools necessary to manufacture, and that the coffee filter and chemical odor were additional evidence of manufacturing. Furthermore, when discussing the Dealing in Methamphetamine charge in closing arguments, the State did not allude to the 0.61 gram of methamphetamine found on the bedroom plate in the same room as the drug paraphernalia. Yet this 0.61 grams of methamphetamine as well as a tied corner baggie associated with purchasing illegal drugs on the street, would support a conviction for Possession of Methamphetamine independent of the finished product found in the coffee filter.

---

[17] The State's argument in this section of its brief again focuses on the jury's guilty verdict for Attempted Dealing in Methamphetamine, and does not address the Dealing in Methamphetamine charge on which the trial court ultimately entered judgment of conviction.

[46] In light of the evidence and argument presented to the jury, we cannot say there is a reasonable possibility that the evidentiary facts used by the jury to establish the essential elements of Dealing in Methamphetamine were also used to establish all of the essential elements of Possession of Methamphetamine. Accordingly, we find no double jeopardy violation.

## Sentencing

[47] We turn now to Green's argument that the trial court abused its discretion in imposing his sentence. Sentencing decisions rest within the sound discretion of the trial court and are reviewed only for an abuse of discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007). An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* (citation and quotation marks omitted). Trial courts must enter a sentencing statement whenever imposing a sentence for a felony offense, and the statement must include a reasonably detailed recitation of the court's reasons for imposing a particular sentence. *Id.* "If the recitation includes a finding of aggravating or mitigating circumstances, then the statement must identify all significant mitigating and aggravating circumstances and explain why each circumstance has been determined to be mitigating or aggravating." *Id.*

[48] A trial court abuses its discretion if it (1) does not enter a sentencing statement, (2) enters a sentencing statement that explains reasons for imposing a sentence

– including a finding of aggravating and mitigating factors if any – but the record does not support the reasons, (3) enters a statement that omits reasons that are clearly supported by the record and advanced for consideration, or (4) considers reasons that are improper as a matter of law. *Jackson v. State*, 973 N.E.2d 1123, 1130 (Ind. Ct. App. 2012) (citing *Anglemyer*, 868 N.E.2d at 490–91), *trans. denied*. A trial court is not obligated to explain why it has not found a factor to be mitigating. *Anglemyer*, 868 N.E.2d at 493. "An allegation that the trial court failed to identify or find a mitigating factor requires the defendant to establish that the mitigating evidence is both significant and clearly supported by the record." *Id*.

[49] Green argues that the trial court's sentencing statement generally was inadequate because the court did not identify specific mitigating or aggravating circumstances or "explain why each factor was mitigating or aggravating." (Appellant's Br. 33.) We disagree. Although no written sentencing statement is included in the record, the court's oral statement at the sentencing hearing clearly identified two mitigating factors and the reasons they were mitigating: (1) Green "has a child that would be affected by the Court's sentence[,]" and (2) "he admitted or plead[ed] guilty to the Habitual Enhancement in this case, and kept the jury, the attorneys and the Court from having to proceed on a second phase[.]" (Tr. 642.) The court then took into consideration Green's criminal history, listing each of his past convictions. The court's statement was thus a reasonably detailed recitation of the aggravating and mitigating factors and reasons for imposing the particular sentence.

[50] Green also contends that the court failed to identify two mitigating factors advanced for consideration at the sentencing hearing. First, he points to the Vanderburgh County Probation Department's pre-sentence investigation report, which states that the results of the Indiana Risk Assessment System – Community Supervision Tool ("IRAS-CST") "indicate [Green] is a low risk to re-offend." (App. 123.) Yet despite evaluating him at a low risk to reoffend, in the same report the Probation Department recommended Green be sentenced to prison terms significantly longer than those the trial court ultimately imposed. Green has failed to establish the significance of the IRAS-CST results as a mitigating factor.

[51] Green also argues that the trial court should have considered as a mitigating factor his cooperation with the police when they entered and searched his apartment. Yet Green argued at the sentencing hearing only that "he cooperated somewhat with the Police" (Tr. 640), and otherwise downplayed the seriousness of his crimes. We see no abuse of discretion in the trial court's failure to find Green's moderate cooperation with the police a mitigating factor.

## Independent Sentence Review

[52] We turn now to Green's contention that his sentence was inappropriate in light of the nature of his offense and his character. Article 7, Section 6 of the Indiana Constitution grants this Court authority to independently review and revise a sentence imposed by the trial court. To implement this grant of authority, Indiana Appellate Rule 7(B) provides: "The Court may revise a sentence

authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). The analysis is not whether another sentence is more appropriate, but whether the sentence imposed is inappropriate. *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). The principal role of our review is to leaven the outliers, and our review is very deferential to the trial court. *Id.* The defendant bears the burden of persuading the appellate court that his or her sentence is inappropriate. *Id.*

[53] Count 1, a Class A felony, carried a sentencing range of twenty to fifty years, with the advisory sentence being thirty years. I.C. § 35-50-2-4. Count 2, a Class B felony, carried a sentencing range of six to twenty years, with an advisory sentence of ten years. I.C. § 35-50-2-5. As a habitual substance offender, Green faced a sentencing enhancement of three to eight years. I.C. § 35-50-2-10(f). Green was sentenced to thirty-five years in the DOC on Count 1, to be served concurrently to twelve years in the DOC on Count 2. (Tr. 643-44.) The court also enhanced Green's sentence on Count 1 by three years due to his habitual substance offender status, yielding an aggregate sentence of thirty-eight years. (Tr. 643.)

[54] Green argues that his sentence was inappropriate because his crime was not violent and he has no past history of violent crime. Instead, he contends that his prior criminal history reveals "an escalation in chemical dependency issues . . . better handled within a therapeutic environment . . . than [in] extended incarceration in DOC." (Appellant's Br. 36.) He further points to the

"paucity" of evidence of his guilt (Appellant's Br. 1), arguing that his connection to criminal activity in this case, if any, "is slight and tenuous." (Appellant's Br. 36.) He also argues that under Indiana Code section 35-50-2-2(b)(1), he "deserved up to 15 years and six years, respectively, suspended from his sentences, based upon the sparse evidence of guilt." (Appellant's Br. 37.)

[55] We first observe that Indiana Code section 35-50-2-2(b), which provides that the trial court *may* suspend to probation any part of a felony sentence (subject to certain exceptions), is a permissive statute. The trial court was under no statutory obligation to suspend to probation any part of Green's sentence.

[56] Second, as discussed above, there was sufficient evidence to support Green's conviction for Dealing in Methamphetamine. Even if we agreed with his contention that he was convicted on "sparse" evidence, the volume of evidence presented has no bearing on our independent appellate review of Green's sentence. Rather, our review looks exclusively to the nature of the offense and the character of the offender. *See* App. R. 7(B).

[57] As to the nature of his offenses, Green collected and constructed all of the precursors and tools necessary to manufacture methamphetamine and possessed finished methamphetamine product. There is nothing extraordinary about the nature of Green's offenses. As to Green's character, the record shows that Green has a prior criminal history, including felony convictions for Possession of a Controlled Substance and Operating a Vehicle While Intoxicated ("OWI"). He also has misdemeanor convictions for OWI (two

counts), Possession of Marijuana, and Driving While Suspended with a Prior Suspension. Green was on probation at the time of the instant offenses. In light of Green's criminal history involving several drug-related crimes, the trial court's imposition of a sentence only slightly above the advisory range for each count, to be served concurrently, was not inappropriate.

# Conclusion

[58] Because the officer's warrantless entry into Green's home did not violate his federal or state constitutional rights, the trial court did not abuse its discretion in admitting evidence obtained after police obtained a warrant based on items in plain view during the warrantless search. There was sufficient evidence to support Green's conviction for Dealing in Methamphetamine. Green's convictions for Dealing in Methamphetamine and Possession of Methamphetamine did not violate double jeopardy principles under the actual evidence test. The trial court did not abuse its discretion in sentencing Green, and Green's sentence was not inappropriate.

[59] Affirmed.

Riley, J., and Barnes, J., concur.